# GATHMANN *v.* CLARKE.

PATENTS; PATENTABILITY; INTERFERENCE; ABANDONED EXPERIMENT;
REDUCTION TO PRACTICE; CONCEPTION.

1. There is nothing patentable in having two sides of a steel ingot substantially parallel and the other sides tapering, unless some useful object is to be attained. Mere facility in handling will not constitute such an object, as any mechanic would know that it would be easier to handle and work an ingot having parallel sides than one whose sides are tapered.

2. Where one of the parties to an interference involving an invention of a method of casting steel ingots so as to prevent "piping" or the formation of hollow spaces in the center of the metal caused by the more rapid cooling of the outer than the inner metal, the result being accomplished by making two of the sides of the ingot and mold approximately straight and parallel and the other sides relatively tapered, produced a mold and a few ingots before the date of the reduction to practice by his adversary, which had the characteristics of the invention of the issue, but used the mold with the big end down, or exactly opposite to the teachings of his specifications; and thereafter scrapped and destroyed the mold and the ingots made from it, it was *held* that the production of the ingots was not only nothing more than an abandoned experiment, but that the making of such mold and ingots failed to show that such party then had a conception of the invention.

3. In an interference proceeding, in order to determine whether one of the parties had a conception of the invention of the issue, it is proper to refer to his specifications to ascertain what advantages he claims for the construction described and how the invention is practised. (Citing *Andrews* v. *Nilson*, 27 App. D. C. 451.)

No. 1037. Patent Appeals. Submitted November 13, 1916. Decided December 4, 1916.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding.          *Affirmed.*

The facts are stated in the opinion.

*Mr. Lloyd B. Wight* and *Mr. W. W. Dodge* for the appellant.

*Mr. F. W. Winter* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

Appeal from a decision of the Patent Office in an interference proceeding awarding priority of invention to the appellee, Alexander Fielder Clarke.

The issue, expressed in six counts, will be sufficiently illustrated by a reproduction of the 1st, 2d, and 3d:

"1. An ingot having some of its sides approximately straight and parallel, and others relatively tapered.

"2. An ingot having two of its opposite sides approximately straight and equidistant from the vertical central axis of the ingot at its upper and lower portions and two intervening sides inclined and converging towards the ingot bottom.

"3. A metallic mold in which the mold cavity has some of its sides approximately straight and parallel while others are relatively tapered or inclined from the upper portion of the mold downwardly towards the bottom thereof."

In the casting of steel ingots the more rapid cooling of the outer metal frequently results in a hollow space in the center. This action is known in the art as "piping." The invention, as will be gathered from a reading of the counts, resides in the shape of the ingot molds and ingots, the object in mind being to prevent, so far as possible, the formation of "pipes" in the ingots and, at the same time, to so shape them as to facilitate their handling and working. The claim originated in the application of Emil Gathmann, who, in his specification, says: "It has been found by numerous experiments that when the mold cavity is larger at its upper than its lower end and gradually tapers toward the lower end, where the cross section is smaller, the lower portion of the ingot freezes or solidifies more quickly as less heat units are contained therein than in the larger portion of the mold." He further states that by making two of the sides

substantially parallel, difficulty in stacking and working them under a steam hammer or hydraulic press is avoided.

The Examiner of Interferences, after an exhaustive review of the evidence, reached the conclusion that Clarke, as early as July 1911, reduced to practice the subject-matter of each of the counts, and in this finding he was affirmed by the two higher tribunals. The evidence upon which this finding is based is so clear. and convincing that we accept it without further discussion.

The Examiner further found that there was no satisfactory evidence that Gathmann had even conceived the subject-matter of the counts of the issue prior to his filing date of November 12, 1912. The Examiners in Chief and the Assistant Commissioner, however, were of the opinion that in August, 1909, a mold was produced under Gathmann's directions. from which a few ingots were cast having the characteristics set forth in counts 1 and 6. This mold, however, was used with the big end down, or exactly opposite to the teachings of the specification, to which reference has been made. The Examiners in Chief ruled that the production of those ingots with two substantially parallel flat sides "was not effected on behalf of Gathmann with any such object in view as is set forth in his specification as the reason for constructing ingots in that form;" that they, as well as the molds by which they were produced, were scrapped and destroyed. The conclusion was reached, therefore, that the production of those ingots amounted to nothing more than an abandoned experiment. In this finding the Assistant Commissioner concurred.

Assuming that the Examiners in Chief and the Assistant Commissioner were correct in their finding that the ingots produced by Gathmann in 1909 possessed the characteristics of counts 1 and 6 (count 6 being substantially like count 1), we agree with those tribunals that what was done at that time amounted to nothing more than an abandoned experiment. But we are disposed to go even farther. In our view, Gathmann did not then have a conception of the invention disclosed in his specification. Obviously, there is nothing patentable in having

two sides of an ingot substantially parallel and the other sides tapering, unless some useful object is to be attained. Mere facility in handling, of course, would not constitute such an object, for any mechanic would know that it would be easier to handle and work an ingot having parallel sides than one whose sides were tapered. The real object, as above pointed out, was to reduce the formation of pipes, and Gathmann himself tells us in his specification that this may be accomplished by having the mold cavity "larger at its upper than at its lower end;" that the cross section at the lower end being smaller and, of course, containing less heat units, that end solidifies very quickly. It is not denied that the mold from which the ingots in question were cast was used in exactly the opposite way, that is to say, with the big end down. While counts 1 and 6 do not specifically state that the two sides of the ingot shall taper toward the lower end, Gathmann's specification, to which we turn to learn the advantages of the construction described and how the invention is practised (*Andrews* v. *Nilson,* 27 App. D. C. 451; *Ryder* v. *Schlichter,* 61 C. C. A. 469, 126 Fed. 487), states that the mold is used big end up. If the theory underlying this invention is correct, and we here must assume it to be, the main object in view (namely, the reduction of pipe) could not be attained by using the mold in the way exactly opposite from that taught by the specification. On the contrary, by inverting the mold the pipe would be increased, and the ingot produced, possessing no novelty other than mere shape, would be unpatentable.

There was some evidence of further activity on the part of Gathmann, but inasmuch as all the tribunals of the Office ruled it to be insufficient, we accept their finding and affirm the decision from which the appeal was taken.          · *Affirmed.*