Samuel EGNOT, Appellant,

v.

Robert LOOKER, Appellee.

Patent Appeal No. 7845.

United States Court of Customs and Patent Appeals.

Dec. 14, 1967.

John A. Blair, Robert L. Boynton, Harness, Dickey & Pierce, Detroit, Mich., for appellant.

George F. Smyth, Los Angeles, Cal., Richard P. Schulze, Washington, D. C., Smyth, Roston & Pavitt, Los Angeles, Cal., for appellee.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.[*]

ALMOND, Judge.

This is an appeal from the decision of the Board of Patent Interferences awarding priority of the subject matter in interference No. 93,815 to the senior party Looker.

The parties herein are the junior party Samuel Egnot, assignor to Huck Manufacturing Company (hereinafter Huck) and Robert Looker, assignor to Brown-Line Corporation. Herein involved are the Egnot application [1] entitled "Fastener Construction" and the Looker patent [2] entitled "Grooved Pin with Reformable Collar to Accommodate Various Thicknesses."

The invention in issue is a fastener construction using a lockbolt for permanently fastening a plurality of rigid members such as metal plates. The invention is illustrated in figures 1, 3, 5, and 6 of the Looker patent.

Figure 1 shows the lockbolt structure, a pin with a head 20 and a shank 22. The shank has a series of circumferential grooves 30 which are preferably uniformly spaced to form a series of uniform intervening circumferential ribs 32.

The lockbolt is used to fasten two rigid plate members together in the manner illustrated in figures 3, 5 and 6. The lockbolt is inserted through aligned bores in plate members 25 and 26. Deformable collar 24 is slipped over the shank end of the lockbolt (Fig. 3). Driving tool 33 is used to complete the installation. The tool has two sections axially movable relative to each other, one having jaws 38 to engage the end of the pin and, on axial movement, to bring the head of the pin 20 and the collar 24 against the plates (Fig. 5). With further axial movement, an anvil 36 on the other section of the tool swages the deformable collar 24 onto the shank of the pin forcing the collar material into the circumferential grooves of the lockbolt. The end of the shank extending beyond the collar is now broken off at a groove adjacent the end of the collar. This may be accomplished by tilting the tool either by means of a canted nose to cause the tool to pivot about point 46 (Figs. 5 and 6) or by a canted shoulder on the collar. The pin may also be broken off by a localized radial compressive stress, caused by an added construction on the anvil, acting with a direct pull.

Each groove 30 (Fig. 1) along the shank of the pin has the same minimum diameter to form "a series of frangible breaknecks." This series of breaknecks permits sheets of various thicknesses to be secured together, since their total thickness will bring one of the breaknecks adjacent the outer end of the collar to be broken off. The ribs 32 (Fig. 1) between the breaknecks are of the maximum diameter of the shank to seat snugly into the opening of the sheet and to be engaged by the jaws of the tool means or by the collar when it has been swaged into the breaknecks.

The counts of the interference correspond to the four claims of the Looker patent and were copied by Egnot at the time his application was filed nearly twelve

---

[*] Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

[1] Serial No. 183,165 filed March 28, 1962.

[2] No. 2,978,946, issued April 11, 1961, application serial No. 639,474 filed February 11, 1957.

Fig.1

Fig.3

Fig.5

Fig.6

months after the Looker patent issued. Count 1 is reproduced as representative:

1. The combination of a plurality of rigid members each having an opening therethrough of a common uniform diameter, said members being adapted to be abutted with said openings aligned, each of said members being of at least a given minimum individual thickness and the combined thickness of said members being within the range of thicknesses extending from a given minimum total thickness to a given maximum total thickness, and a fastening means to extend through said aligned openings to cooperate with a deformable collar for interconnecting the members, said fastening means comprising a pin with a shank and a head on one end of the shank, said shank having a substantially uniform maximum diameter throughout and having a series of axially spaced circumferential grooves, each providing the minimum diameter of the shank and *forming a series of frangible breaknecks* and forming therebetween spaced ribs of said maximum diameter to seat snugly in any of said openings and to be engaged by said collar by swaging of the collar into the breaknecks, said series of breaknecks extending from the second end of the pin to at least a point spaced from said head by said given minimum total thickness so that the collar will engage a rib of the pin adjacent a plurality of the members of said given minimum total thickness as well as adjacent any plurality of said members of greater total thickness within said range, the spacing of said ribs being substantially less than said given minimum individual thickness so that when said series of breaknecks extend through any of said members at least one of the ribs will lie between the planes of the opposite faces of such members to maintain said openings of the members in alignment, said shank being of a length substantially greater than said given maximum total thickness plus the axial dimension of said collar whereby the shank may extend through a plurality of said members of said given maximum total thickness and through and beyond said collar to be engaged by tool means *and whereby in securing together any plurality of said members of a total thickness within said range, the shank may be broken off at a breakneck immediately adjacent the outer end of said collar.* [Emphasis added.]

At the outset, it is pertinent to note that Egnot is here making claim to an invention previously claimed in a patent to Looker. The Looker patent was granted April 11, 1961. On March 28, 1962 Egnot filed his application presenting the claims in issue, accompanied by a letter applying the claims to the disclosure of his application.

Under such circumstances Egnot is charged with the burden of proving priority of invention beyond a reasonable doubt. Conner v. Joris, 241 F.2d 944, 44 CCPA 772; Walker v. Altorfer, 111 F.2d 164, 27 CCPA 1130.

Egnot worked for Huck Manufacturing Company of Detroit from 1952 or 1953 until September 1962 as a sales engineer. Looker, who was sales manager of the company, became vice-president in charge of sales in 1954, leaving the company in August 1956 and moving to California where he became president and one of the principal owners of the Brown-Line Corporation, his assignee. The witness Dobbe, director of Government Technical Services for Huck, preceded Looker as vice-president in charge of sales. Egnot bases his claim to priority on a drawing which he made and disclosed to Looker and Dobbe in 1954.

Egnot Exhibit 1 is a copy of a patent [3] assigned to Huck which is representative of the prior art in the lockbolt field. This patent discloses a lockbolt in which the shank has three types of grooves. Near the head are "locking grooves," a grooved portion having annular ribs and groove bottoms into which the collar is

---

3. Patent No. 2,531,048 granted November 21, 1950.

swaged. At the end of the shank are "pull grooves," a grooved portion adapted to be gripped by jaws of the tool used to pull the pin and collar into place. Between these sets of grooves is a single "breakneck groove" where the end of the pin is broken off by increased pull. The breakneck groove has a smaller diameter than the other grooves, and is the minimum diameter of the shank of the pin. The patent states that it "is the weakest part of the pin so that the pin will break under tension at this location before it will break under tension at any other location." .

As to the function of a breakneck groove, Egnot testified:

Considering all forces of the tool, the swaging of the collar, the breakneck was determined by engineering at Huck to break at a higher load value in tension so that after swaging you would increase the pulling effect on the pin tail section and then a break would occur at the top or in that portion called No. 21 [breakneck], leaving a fastner without a pin tail section.

Relative to the engineering at Huck, Looker on cross-examination more specifically described the characteristics of a breakneck groove:

A breakneck groove is an annular recess designed to break at a predetermined force, is characterized by exacting design of its diameter with relation to the other diameters and dimensions of the pin itself, its sloped surface angles, the metallurgy of the pin per se, that is, its brittleness, ductility, tensile strength, modules of elasticity, et cetera, and as such is distinctly characterized from the grooves more commonly known as locking grooves or pull grooves.

The Huck patent discloses that the breakneck groove therein would permit only a limited variation in the total thickness of the plates to be secured together. If the plates were appreciably thinner than shown in Huck figure 2, in the finished lockbolt the end of the pin would extend an undesirable distance beyond the end of the collar. If much thicker than shown, the breakneck would be an undesirable distance within the collar.

Egnot Exhibit 3 is the drawing which is the basis for Egnot's claim to priority. Egnot testified that he completed the drawing on October 8, 1954 and submitted it to Looker and Dobbe on October 18, 1954. When asked about the drawing of Exhibit 3, Egnot stated that his first concept was an "all-grip lockbolt" so that "it would attach thin sheets as well as thick sheets in one operation." It is noted that all of the grooves shown in Egnot Exhibit 3 are of the same construction designed to function as pull grooves in cooperation with the jaws of a tool, or locking grooves in cooperation with a deformable collar, and that the grooves are uniformly spaced from the head to the end of the shank. This being so, there is no groove of less diameter than the other as disclosed in the Huck patent such as the breakneck 21.

Egnot further stated with reference to Exhibit 3:

This is my first concept of the all-grip lock bolt but then also I became concerned as to the *method of nipping off the remaining portion of the pin tail* that extended beyond the collar, so that by incorporating two ideas to submit to my boss at that time, Mr. Looker, I came up with the sketch as a suggested *method of cutting off the pin as close to the top of the collar as possible.* [Emphasis supplied.]

In order to nip or cut off the pin tail, Egnot provided a pair of jaws in the driving tool which would close about the pin tail immediately adjacent the collar, and notch the pin at that point. When the driving tool was pulled away from the workpiece, the lockbolt would presumably break at the point of the notch.[4] Ac-

4. In answer to a question on cross-examination, Egnot stated:

I wouldn't know where this thing would break. If you did notch at the crest, it would be possible to fracture at that point. However, again, it could travel downward to the groove and crack and break off at the groove.

cording to Egnot's testimony, the point where the jaws notched the pin was not necessarily at the bottom of the groove, but could be anywhere between the groove and the crest of the rib, even on that crest.

It is significant that Looker's testimony as to his understanding at the time Egnot disclosed to him the drawing does not, in substance, conflict with that of Egnot. Looker testified that his understanding of the Egnot disclosure to him was that there was no breakneck groove provided and that the pin was not intended to be *broken* but was intended to be *cut off* at the top of the collar at the conclusion of the driving operation. He stated specifically that when Egnot came to him prior to October 8, 1954, the date of the drawing, the idea he expressed to Looker was to eliminate the necessity for providing grip-limiting breakneck grooves by use of a device for cutting off the extending pin tail from a partially driven lockbolt.

The drawing made by Egnot shows the jaws cutting into the shank of the pin near a crest. This fact is hard to reconcile with Egnot's opinion that the jaws "could travel downward to the groove and crack and break off at the groove." Further, concerning the grooves of Egnot's concept, Dobbe testified:

> Q12. Then, in accordance with your recollection and looking at Exhibit No. 3, do you recall how many different kinds of grooves the pin had? A. This pin here would have just one type of groove for its entire length. *It would be a combination of a pulling and locking groove* and would only have one type of groove for its entire length. [Emphasis added.]

This testimony strongly supports the conclusion that Egnot Exhibit 3 omitted the breakneck groove 21 of Egnot Exhibit 1 using in lieu thereof a series of grooves of just one type, a combination of pulling and locking grooves.

The Looker patent, on the other hand, affords a clear discussion of the grooves of the Looker embodiment in contradistinction to the Egnot concept:

> A certain problem arises with regard to the function of the circumferential grooves as selective breaknecks. The use of tension stress in the prevalent prior art practices to cause severance of a breakneck portion requires that the breakneck portion be greatly weakened. One reason for greatly weakening the pin at this point is that the single breakneck of the prior art fastener must be the weakest point of the pin by a liberal margin to make sure that the shank breaks off at this particular point in response to the final tensioning of the pin. A second reason for greatly weakening the pin at the breakneck is to keep the required magnitude of tension force within practical limits. Obviously if such a highly weakened point of the shank were positioned in the aligned holes of the plurality of members or were even positioned inside the deformable collar, the effective strength of the installed lockbolt would be reduced to an unacceptable degree. The problem, then, is to provide spaced circumferential grooves that are deep enough for selective use as breaknecks but, nevertheless, provide sufficient strength to carry the tensile load required of the installed lockbolt.
>
> The present invention solves this dilemma by combining two separate forces to break off the pin at circumferential grooves selectively. The first force is the usual tension force for straining the shank longitudinally. The second force is a localized transverse force. The addition of this second transverse force has two advantages. One advantage is that the combining of the two forces makes it possible to break the shank at the axially spaced grooves without requiring that the axially spaced grooves be so deep as to weaken the lockbolt

Again, I couldn't say one way or the other. Again, the tool—I don't even know if it even would work; it was just a suggested practice.

unduly. The second advantage is that the transverse force may be selectively localized to cause the pin to break off at any selected circumferential groove.

The second transversely applied stress may be, for example, either a localized bending stress or a localized transverse compression stress. The compression stress may be, if desired, radial compression applied uniformly around the circumference of the pin shank.

\* \* \* \* \* \*

It is further to be noted that the grooves 30 are of sufficient depth to permit the pin to be broken off at a selected groove by the application of stress in tension together with the application of a transverse stress as heretofore described. This groove depth, however, is much less than the groove depth required for the breakneck of a conventional pin.

It seems clear, therefore, that Looker discloses a modification of the breakneck groove 21 of Egnot Exhibit 1. The Looker groove is not as deep but sufficiently deep to serve as a breakneck in his invention, described in the count as "forming a series of frangible breaknecks." The Egnot concept distinctly differs in that his combination is a pulling and locking groove, requiring some further device for "nipping off" or "cutting off" the pin close to the collar.

We consider of evidentiary importance in resolving the factual issue here presented the letter dated October 19, 1954, Egnot Exhibit 5, sent by Looker to patent counsel for Huck. This letter transmitted Egnot Exhibit 3 and embraced Looker's comments thereon. The letter described the Egnot bolt or pin as "having only locking grooves with no pull grooves, no shank, or very little shank, and no breakneck." It referred to the device for "cutting off the pin after the fastener had been swaged" by forcing section "B" against the pin. It was stated that the proposed structure "may have a very substantial commercial value" and should be held "until we see if it works."

Looker stated that no determination was made, during the remainder of the time he was employed at Huck, as to whether the proposed Egnot device would work. The reason given was that the invention "appeared to be impractical because of the delicacy and of the probable difficulty of making the little jaws not only cut but stand up in service."

Looker emphatically denied that Egnot had ever disclosed to him "any fastener which formed a series of frangible breaknecks":

XQ21. Actually, I believe you previously testified he didn't discuss the presence of breakneck grooves in the sense in which you have described a breakneck. A. That is correct, nor did he discuss the severing of the pin *at any groove*. The pin was cut off by an apparently novel useful and new means and the pin per se—correction, and the cutters per se was the invention that Mr. Egnot disclosed to me.

■ We have reviewed the factual details of this sizable record and are persuaded that the gist of the controversy and the proper conclusion have been stated by the board as follows:

It will be recalled that when asked if any one of the grooves shown in his Exhibit 3 drawing could or might function as a breakneck Egnot explained that Section B or the "red portion" *might* be located in one of the grooves to make a "notch effect" that would reduce the cross sectional area of the pin \* \* \*. In a sense, this would make the groove deeper to convert *only this one* of the series of grooves into a breakneck, but would not provide "a series of frangible breaknecks," any one of which could be broken by bending or wedging forces. Thus this alleged capability or possibility would not establish that Egnot conceived the invention defined in the count, which recites that the grooves form "a *series* [emphasis present] of frangible breaknecks" whereby the shank may be "broken off" at a breakneck immediately adjacent the outer end of "said collar." These limi-

tations aptly describe Looker's concept, while Egnot's concept involved the use of means for "cutting off" the pin close to the collar. Accordingly, and for the reasons previously stated, we hold that Egnot has not established that he conceived the invention defined by the counts prior to February 11, 1957, Looker's filing date. For similar reasons, we hold that Egnot has not established that he disclosed the invention in issue to Looker prior to that date [citations omitted]. Since Egnot has no actual reduction to practice or diligence as early as Looker's filing date, Looker is entitled to prevail. [Emphasis added.]

We have noted appellant's contention that the sole question in this case is whether Looker derived the invention in issue from Egnot. Suffice it to say that not only is this charge not supported by the evidence but also it is substantially negated by the testimony of Egnot himself. There can be no derivation without prior conception on the part of the party alleging derivation.

We have examined the cases cited and the arguments advanced by counsel but we are not convinced of reversible error on the part of the board in awarding priority of invention to Looker.

The decision of the board is affirmed.

Affirmed.

SMITH, Judge (dissenting).

In my opinion, the evidence on behalf of Egnot presented in the record before this court is legally sufficient to prove conception of the invention set forth in the counts of the interference by Egnot prior to Looker. I, therefore, would reverse the decision of the board.

Evidence of conception must be evaluated according to the objective standard of what it teaches one of ordinary skill in the art. E. g., Spero v. Ringold, 377 F.2d 652, 54 CCPA —— (1967); Townsend v. Smith, 36 F.2d 292, 17 CCPA 647 (1929). Under the test of the *Spero* case, the evidence of Egnot's conception must be evaluated to determine what Egnot disclosed to Looker and what this disclosure means to one of ordinary skill in the art.

The invention set forth in the counts of the interference includes a fastener having a grooved pin in which *all* of the grooves are of the *same* construction. The pin has a shank which has a substantially uniform maximum diameter throughout. The pin further contains a series of axially-spaced circumferential grooves, *each* of which provides the minimum diameter of the shank. The grooves form a series of "frangible breaknecks." The count recites "spaced ribs of said maximum diameter" formed between the "frangible breaknecks." The count further specifies that the shank *may be broken off* at a "breakneck" immediately adjacent the outer end of a deformable collar.

The record clearly shows that Egnot's pin was conceived with a plurality of grooves, all of which were the same. Both Egnot's testimony and his drawing, completed on October 8, 1954, support that conclusion. Thus, I agree with the appellant that it would be impossible for any *one* groove to perform *only* the singular function of serving as *a* breakneck. Egnot's conception thus clearly meets the structural limitations of the counts of this interference.

Moreover, the evidence clearly shows that Egnot disclosed the "like groove" concept to others, particularly Looker and Dobbe. Thus, I think that one of ordinary skill in this art would consider that each of a plurality of like grooves would be inherently capable of functioning as a "breakneck" in the device disclosed by Egnot.

I find further support in the record for my conclusion in the Huck '048 patent, where the "breakneck groove" was constructed to be the weakest section of the pin, so that the pin would fracture at that point upon the application of a breaking force. Since all of the grooves of the interference counts are of like construction, no one groove could be singled out as a "breakneck." It therefore follows that one of ordinary skill

in this art would consider each of the grooves of the Egnot disclosure to be capable of serving as a "breakneck" in the same manner.

In evaluating this invention, it also seems to me that, since each of the grooves is capable of acting as a "breakneck," selection of *the* particular groove which will act as *the* desired "breakneck" must be determined by some means apart from the pin itself. However, the tool, or "breaking means," which "selects" the particular groove to function as a "breakneck" is not included in the specific language of counts in this interference. The entire invention embodied in the counts in issue, in my opinon, has been disclosed by Egnot, prior to Looker. Those differences which may be present between the "breaking means" of Egnot and the "breaking means" of Looker are of no moment in considering priority as to the specific counts in this interference. In my view, the board's reference to the tool for performing the breaking function was irrelevant.

Upon an evaluation of the evidence of that which Egnot, in fact, disclosed, in the light of what the disclosure would mean to one of ordinary skill in the art, I would reverse the decision of the board.