payment of $60,000 to Bogley's widow, and plaintiff's petition for a refund of the amount of such assessment is dismissed.

The case is remanded to the trial judge for a determination of the amount due the plaintiff under Rule 131(c) by reason of this judgment.

**AMAX FLY ASH CORPORATION** *

v.

**The UNITED STATES.**

**No. 261–69.**

United States Court of Claims.

April 16, 1975.

---

* The above named plaintiff substituted for Dayton Fly Ash Co., Inc. by order of April 4, 1973.

Gilbert N. Henderson, Dayton, Ohio, for plaintiff. Lawrence B. Biebel, Dayton, Ohio, attorney of record. Richard A. Killworth and Biebel, French & Bugg, Dayton, Ohio, of counsel.

James D. Stokes, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, New York City, for defendant. Roland H. Shubert, of counsel.

Before DAVIS, SKELTON, and KASHIWA, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on defendant's exceptions to a recommended decision filed by Trial Judge Hal D. Cooper on May 23, 1974, pursuant to Rule 134(h), having been submitted to the court on oral argument and the briefs of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. It is, therefore, concluded that claim 1 of U.S. Patent No. 3,421,587 is valid and infringed and that plaintiff is entitled to recover reasonable and entire compensation for unauthorized use by defendant. Judgment is entered, accordingly, for plaintiff with the extent of defendant's liability to be determined in further proceedings pursuant to Rule 131(c)(2).

### OPINION OF TRIAL JUDGE

COOPER, Trial Judge:

Plaintiff alleges unauthorized use by defendant of an invention described and claimed in its U.S. Patent No. 3,421,587, entitled "Method For Mine Fire Control," issued January 14, 1969, in the names of Heavilon, Jones, and Thomas.

At issue is defendant's liability under 28 U.S.C. § 1498 for mine-fire control work performed at Monongahela City, Pennsylvania, by the Bureau of Mines.[1] Defendant denies any infringement of the patent, but asserts it is invalid and unenforceable, in any event. In addition, defendant contends that an employee of the Bureau of Mines, Malcolm Magnuson, was the originator of the process used at Monongahela City and that the patentees derived the invention from him. Alternatively, defendant maintains that Magnuson was, with the patentees, a coinventor of the process. Finally, it is contended that defendant has the right to use the invention without liability either by reason of being a joint venturer with plaintiff during its development or by reason of an implied license.

For the reasons stated hereinafter, none of these defenses can be sustained and it is concluded that plaintiff is entitled to recover.

The technical subject matter in this suit relates to fly ash and a method for its use in controlling fires in abandoned mines. Abandoned-mine fires have a long history in Allegheny County, Pennsylvania, many of them burning for years, creating a health hazard, generating pollution, and inducing subsidence of the land surface. Responsive to the problems associated with these fires, both state and federal programs have been developed to combat them. The Bureau of Mines has been active in mine-fire control work since at least as early as 1949 when it created a Fire Control Group, with headquarters at Pittsburgh, Pennsylvania. By legislation enacted in 1954, funds were provided both for control and extinguishment of mine fires, and for conducting research in connection with such fires. By 1967, the Bureau had substantial experience in this field and had developed a number of techniques, including surface sealing, trenching, loading out, and water flushing, for fighting fires in abandoned mines.[2]

The patent proposes a method of controlling mine fires by pneumatically injecting a mixture of air and fly ash down a borehole into the mine cavity. Fly ash is the residue resulting from the combustion of ground or pulverized coal and is carried from the boiler by flue gases. Separated from the flue gases, it appears as a finely divided powdery substance. When mixed with air, fly ash flows like water; in a settled and aerated condition, it has an angle of repose (the angle the sides of a pile of fly ash form with the horizontal) of only about 8° to 10°. Although some commercial uses of fly ash have been found, it is generally regarded as a waste product.[3]

According to the patent, pneumatic equipment such as a tanker is used to mix air with the fly ash and inject the mixture into the mine. Despite its water-like characteristics, the powdery fly ash creates a barrier of fly ash, from the floor to the roof, through which the fire will not burn. Due to the pressure under which it is injected, the fly ash is carried by the air into the cracks and fissures in the cavity through which air would otherwise be supplied to the fire. By forming an incombustible barrier completely blocking off the mine cavity, and by filling all the small cracks and voids, the fire is denied air and will ultimately die out. The patent further proposes to inject the fly ash directly onto the fire as a means of smothering it. Also contained in the patent is the disclosure that the barrier of fly ash formed in the mine cavity will provide support for the overburden, thereby preventing subsidence of the surface.

The patented process was developed in mid-1967 following a meeting between

1. Accounting, if any, has been deferred to later proceedings.

2. The responsibility of the Bureau of Mines is as stated in 30 U.S.C. §§ 551–58 (1964). A description of the techniques developed for fighting fires is contained in the findings.

3. In 1965, only about 3% of the 20 million tons of fly ash produced was used commercially. Disposing of this waste product is a substantial problem. Utility companies will frequently pay someone to dispose of it for them.

defendant's employee Magnuson and plaintiff's employee Heavilon. It is this meeting, together with a demonstration at Monessen, Pennsylvania, in July 1967, in which both parties participated, that gives rise to the inventorship and license issues in this case. However, before reaching those issues, validity and infringement will be considered.

## VALIDITY

Defendant contends that claim 1 is obvious under 35 U.S.C. § 103. Claim 1 is as follows:

A process of controlling a fire in or supporting the earth above an underground mine shaft or other earth cavity, comprising the steps of drilling a plurality of spaced holes through the overburden into the mine shaft, mixing air and finely granulated non-combustible fly ash having a size which permits at least 90% to pass through a 50-mesh screen and 75% to pass through a 325-mesh screen, injecting said mixture into the holes to fill the mine shaft beneath the holes with the fly ash, said injecting step having a sufficient volume and pressure of air so that the fly ash is carried by the air into the cracks and voids through which the air escapes to fill such cracks and voids with the fly ash, said injecting step including filling the mine shaft with fly ash along a substantial length of mine shaft to a depth equal to the vertical height of the mine shaft to create a fly ash barrier through which fire cannot burn and to provide vertical support for the earth above the mine shaft, and then closing and sealing the holes.

In support of this defense, defendant relies principally on Anderson et al patent No. 3,152,842, Schmidt et al patent No. 2,710,232, and Bureau of Mines Report 4808.

The Anderson patent discloses a typical bulk pneumatic tanker of the type usable in practicing the patented method. It is undisputed that dry fly ash was being transported commercially by such tankers prior to the invention and that plaintiff was using such tankers in its business. The patent adds nothing to what was concededly the commercial method of transporting fly ash.

The Schmidt patent and Report 4808 both relate to a coal gasification experiment conducted at Gorgas, Alabama, by the Bureau of Mines in 1950. The purpose of the experiment was to gasify coal by igniting a coal seam and flowing air into contact with it. To enhance the contact between the air and the coal face, a barrier was formed in the mine cavity by pneumatically injecting sand through a borehole. This barrier served to retain the subsequently injected air in direct contact with the burning coal, thus enhancing the gasification process.

The experiment is covered in detail in Report 4808. The Schmidt et al patent discloses the method and apparatus used at Gorgas for fluidizing the sand and injecting it into the mine cavity.

There are substantial differences between the claimed method and this prior art, as well as the other prior art cited by defendant. Suffice to say there is nothing in any of the prior art references suggesting the pneumatic injection of aerated dry fly ash for mine-fire control work, or indeed, the use of any similar dry powdery material having a low angle of repose for building a barrier, whether for mine-fire control or surface-subsidence prevention. In view of these differences, the question is whether it was obvious to one of ordinary skill in 1967 to utilize a method of building a structural barrier by employing only air and a dry powdery material.

The unobviousness of the method is, in large part, demonstrated by the known disadvantages of the techniques heretofore employed by the Bureau in fighting mine fires. For example, defendant had previously used fly ash in a water slurry that was injected into the mine to build a barrier. One problem with the water-slurry method was that it was difficult to contain the fine particulate material; the water tended to drain away, carrying with it the small particles from which the barrier was to be constructed,

and causing extensive settling. Fly ash, when aerated, exhibits the characteristics of water; hence, aerated fly ash would have suggested to those skilled in the art the very disadvantages with which they were familiar.

Related to this is the dusty, powdery nature of dry fly ash of the size specified in the claim. When dry fly ash is mixed with air and blown into a mine, the problem of confining the fly ash to build a structural barrier would appear to be severely aggravated. Indeed, when the process was first proposed, Bureau employees anticipated that the fly ash would simply dissipate as dust, instead of forming a barrier. Yet, a superior structural barrier is in fact formed by the claimed process.

Moreover, the patented process requires the injection of air into the mine. The use of air is directly contrary to the usual fire-control practice of denying air to the fire. This was another objection initially expressed by the Bureau.

Facts such as these distinguish this case from those in which the natural evolution of the art pointed the way to the claimed invention. Rather, the instant invention, by employing materials and process steps that, to one of ordinary skill, suggested problems rather than a solution, proceeds in a direction contrary to the prior art. This strongly supports the unobviousness of the claimed process. United States v. Adams, 383 U.S. 39, 52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

Other considerations support this conclusion. The lack of pertinence of the Gorgas experiment as a mine-fire control technique is demonstrated by the fact that, when the experiment was concluded and it was desired to extinguish the fire in the mine, water was pumped into the mine for 8 weeks to inundate the fire. The inundation technique was used despite the fact that there were, on the Gorgas site, both a powerplant that was a source of fly ash and pneumatic-injection equipment.

The failure of others, including those highly skilled in the pertinent art, to propose this method is also a factor to be considered. Palmer v. United States, 423 F.2d 316, 191 Ct.Cl. 346 (1970), cert. denied, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 258; Jones Knitting Corp. v. Morgan, 361 F.2d 451, 457–58 (3d Cir. 1966). Fly ash is an old, well-known material. The Bureau, in addition to the Gorgas work in 1950 and early projects in which fly ash had been water flushed, had experimented with pneumatic injection of various materials such as mineral wool and sand. Also, gravity injection of dry sand, slag, and rock dust had been attempted. In 1966, the Bureau gave extended consideration to the use of fly ash but decided to use it in the conventional water-slurry process. Significantly, notwithstanding all of the prior work that is now asserted to render the invention obvious, it did not occur to any of these highly skilled people to try pneumatic injection of aerated dry fly ash. This failure of others, long occupied with the problem of mine-fire control, to propose the patented method, undercuts the contention the invention was obvious. LaSalle Street Press, Inc. v. McCormick & Henderson, Inc., 445 F.2d 84, 93 (7th Cir. 1971); Blaw-Knox Co. v. Barber-Greene Co., 176 USPQ 214 (N.D.Ill.1972).

The reactions of those skilled in the field, once the invention was developed, is also a pertinent consideration. AMP, Inc. v. Molex Products Co., 329 F.Supp. 1364, 1373 (N.D.Ill.1971); Hunt Industries, Inc. v. Fibra Boats, Inc., 299 F.Supp. 1145, 1149 (S.D.Fla.1969). Almost immediately after the process was demonstrated, fire-control projects, originally planned to use a water-slurry injection technique, were altered by the Bureau of Mines to require pneumatic injection of dry fly ash. News articles hailed the process as one having great promise. Subsequent work by the Bureau at its experimental mine confirmed that the claimed process had substantial advantages over prior techniques, and employees of the Bureau extolled its virtues. It is also significant that the Bureau itself viewed the process as new

and unobvious in a patentable sense, and sought, through an application filed by its employee Malcolm Magnuson, to obtain a patent on it.[4]

■ In summary considering the state of the art in the field of abandoned-mine fire control, the level of skill in that art, the differences between the claimed process and the prior art, and the relevant secondary considerations, Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), it is concluded that the process of claim 1 was not obvious within the meaning of 35 U.S.C. § 103 and that, therefore, claim 1 is valid.[5]

## INFRINGEMENT

Defendant argues infringement has not been demonstrated because it has not been shown that fly ash of the claimed size was in fact used at Monongahela City. Defendant also asserts that it did not employ a method which included the step of "closing and sealing the holes" as required by the claim.

Neither contention can be sustained. The specification for the Monongahela City project expressly required the use of fly ash having the claimed size. Further, the evidence is that the method employed at Monongahela City was the same as that earlier employed by defendant on a mine-fire control project at Lloydsville, Pennsylvania.[6] Defendant's analysis of the fly ash indicates that the fly ash used at Lloydsville fell within the claimed range of sizes.

In view of the evidence, and since defendant offered no evidence to the contrary, the only inference is that this limitation of the claim was present. Palmer v. United States, supra; cf. Marconi Wireless Telegraph Co. v. United States, 99 Ct.Cl. 1, 57–59 (1942), modified on other grounds, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943).

As to the closing and sealing step, defendant, instead of leaving the casing in the ground and capping it, pulled the casing and filled the hole with dirt. Quite literally, this is a "closing and sealing" of the hole and is the full equivalent of capping a casing.

Plaintiff has sustained its burden of demonstrating infringement of claim 1. Autogiro Co. of America v. United States, 384 F.2d 391, 181 Ct.Cl. 55 (1967), rehearing denied, 184 Ct.Cl. 801 (1968).

## INVENTORSHIP

As noted above, the inventorship issue centers around a meeting on June 29, 1967, between Malcolm Magnuson, an employee of the Bureau of Mines, and Jerry Heavilon, one of the named-inventors and an employee of plaintiff. That meeting was initiated by Magnuson to obtain information regarding the bulk pneumatic tanker trucks plaintiff was using to transport fly ash. Neither Magnuson nor Heavilon could recall critical aspects of the conversation held on that day but it is undisputed that, when the two men parted, they had agreed that a test would be conducted, at a site to be selected by Magnuson, in which plaintiff would pneumatically inject dry fly ash down a borehole into a mine cavity.

On July 19, 1967, the test was conducted at Monesson, Pennsylvania, the site selected by Magnuson. Using plaintiff's equipment, fly ash was injected pneumatically down both a cold borehole and a borehole directly over the fire burning in the underground mine. Both Heavilon and Magnuson were present at the test and they, as well as all others present, believed it to be a success.

Thereafter, and in the following sequence, the Bureau of Mines issued a specification calling for pneumatic injection of dry fly ash as a fire-control

---

4. The circumstances giving rise to the filing of that application are discussed, infra.

5. Plaintiff has proposed no findings, and makes no argument, regarding infringement of claims 2–5. Accordingly, plaintiff's claim for compensation is deemed to be restricted to

claim 1. It is, therefore, unnecessary to consider the validity and infringement of claims 2–5.

6. The Lloydsville project was completed prior to issuance of the patent and is not asserted as the basis for a claim for compensation.

method, plaintiff filed its patent application, and, substantially later, Magnuson filed a patent application claiming essentially the same method as the patent in suit.

As its principal attack on inventorship, defendant vigorously maintains that Magnuson was the originator of the claimed process and that Heavilon, during the course of the meeting on June 29, 1967, derived the idea from him. Plaintiff, with equal vigor, denies that this is the case.[7]

■ The parties are in general agreement as to the applicable law. To sustain its defense of derivation, defendant must show that Magnuson had both a prior conception of the invention and that he disclosed it to Heavilon. Shumaker v. Paulson, 136 F.2d 700, 703, 30 CCPA 1156 (1943).

■ The conception must be more than the realization of a desirable result, Garrett Corp. v. United States, 422 F.2d 874, 190 Ct.Cl. 858 (1970), cert. denied, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257, and more than a mere hope or expectation, Alpert v. Slatin, 305 F.2d 891, 894, 49 CCPA 1343 (1962).

It is said that conception has been achieved when "the inventive idea is crystallized in all of its essential attributes and becomes so clearly defined in the mind of the inventor as to be capable of being converted to reality and reduced to practice by the inventor or by ones skilled in the art." Technitrol, Inc. v. United States, 440 F.2d 1362, 1369–70, 194 Ct.Cl. 596, 609 (1971).

■ It is the usual rule that a claim of prior conception requires corroboration. Kardulas v. Florida Machine Products Co., 438 F.2d 1118, 1121 (5th Cir. 1971); Westinghouse Electric Corp. v. Bulldog Electric Products Co., 106 F.Supp. 819, 873 (N.D.W.Va.1952), aff'd, 206 F.2d 574 (4th Cir. 1953), cert. denied,

346 U.S. 909, 74 S.Ct. 240, 98 L.Ed. 406. However, the existence of corroboration is to be determined by viewing the evidence as a whole. Richardson v. Cook, 442 F.2d 1398, 58 CCPA 1274 (1971); Beeber v. Krogh, 403 F.2d 743 (CCPA 1968).

■ Once conception has occurred, the inventor may use the services and assistance of others to perfect his invention without losing his right to a patent. Hobbs v. United States Atomic Energy Commission, 451 F.2d 849, 864 (5th Cir. 1971).

The parties' principal disagreement on the law is as to the standard of proof applicable where the defense of derivation is asserted. Plaintiff maintains that the evidence must be "clear and convincing" while defendant insists that only a "preponderance" is required.

■ Plaintiff's position is the correct one. The inventors as named in an issued patent are presumed to be correct. Acme Highway Products Corp. v. D. S. Brown Co., 431 F.2d 1074 (6th Cir. 1970), cert. denied, 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971); Mueller Brass Co. v. Reading Industries, 352 F.Supp. 1357 (E.D.Pa.1972), aff'd without opinion, 487 F.2d 1395 (1973). Claims of prior inventorship are "subjected to the closest scrutiny," The Barbed Wire Patent, 143 U.S. 275, 285, 12 S.Ct. 443, 36 L.Ed. 154 (1892), and "evidence to prove prior discovery must be clear and satisfactory," Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 327, 67 L.Ed. 523 (1923). Since conception is an act of the mind, 1 Rivise & Caesar, Interference Law and Practice § 118 (1947), the temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier, is simply too great to permit a lower standard.[8] *The Barbed Wire*

---

7. The very able presentations of counsel have been of great assistance in resolving what is a most difficult issue, involving as it does a determination of the state of mind of an individual at a particular time.

8. Defendant's witness Magnuson demonstrated a commendable appreciation for this problem. He forthrightly acknowledged the difficulty of separating in his mind what were the actual facts from what he now, years later, would assume the facts to have been.

*Patent, supra; Acme Highway Products Corp., supra.* Nor is the standard of proof any lower when a prior conception is asserted as the basis for a derivation argument. *Egnot v. Looker,* 387 F.2d 680, 55 CCPA 782 (1967); *Williams v. Clemons,* 57 App.D.C. 248, 19 F.2d 798 (1927).

Thus, to sustain its defense of derivation, defendant must first show, by clear and convincing evidence, that Magnuson had a prior conception of the claimed subject matter. Since the conception must have been of the invention defined in the claims, *Ritter v. Rohm & Haas Co.,* 271 F.Supp. 313, 323 (S.D.N.Y.1967), it is well that an analysis of this issue starts with the claim itself.

Claim 1 is a method claim, delineating certain method steps to be employed while using certain defined materials to accomplish a specified result. The materials specified are air and fly ash, with the fly-ash size being so defined that it is in the nature of an essentially powdery substance. Using these two defined materials, the claimed method specifies, first, mixing the air with the powdery fly ash and, second, injecting the mixture under sufficient volume and pressure of air into a mine cavity so that the injecting air carries some of the fly ash into the cracks and voids while depositing the remaining fly ash to build up an incombustible structural barrier from the floor to the roof along a substantial length of the mine. It is this claimed invention that is the focal point around which the inquiry into prior conception must revolve.

In the context of the claimed process, it is well to note at the outset that it is insufficient, on the issue of prior conception, merely to show prior knowledge of the broad idea of hooking up a pneumatic tanker to a borehole extending into a mine cavity. Rather, it must be shown that, in addition to this broad idea, there was a realization, in finite terms, of the means or process steps by which the desired result of extinguishing a fire would be achieved. *Gathmann v. Clarke,* 45 App.D.C. 512

(1916); *Forgie v. Oil-Well Supply Co.,* 58 F. 871 (3d Cir. 1893); *Biel v. Chessin,* 347 F.2d 898, 52 CCPA 1607 (1965); I Robinson on Patents § 79 (1890).

Turning then to the issue of whether Magnuson, prior to June 29, 1967, had a conception of at least the critical features of the claimed invention, the evidence falls substantially short of being clear and convincing that he did. Magnuson testified that he first learned about bulk pneumatic tankers for hauling fly ash on June 26, 1967, during the course of a chance conversation with Donald Nagode and Jesse Cutlip. Both of these men were familiar with fly ash and the use of bulk tankers for transporting that material. During the course of this conversation, Nagode explained how the tankers were used to blow dry cement or dry fly ash into storage bins and commented that if fly ash could be blown up into bins, it could be blown down into a mine. Nagode and Cutlip then briefly outlined the operation of these tankers to Magnuson and suggested that he contact plaintiff for any further information. Thereafter, Magnuson attempted to obtain, over the telephone, some additional information regarding the trucks but was referred to Heavilon and a meeting was then set up for June 29, 1967.

Although Magnuson testified that Nagode's disclosure of the existence of pneumatic tank trucks "looked like the answer to what we were wrestling with here these months about the use of fly ash," the evidence does not satisfactorily demonstrate that this "answer" was a conception of the claimed invention. Magnuson did not amplify his testimony in this respect so it is uncertain what he conceived to be the "answer." However, he had no experience with dry fly ash and no specific knowledge about pneumatic tankers, how they operated to aerate fly ash, and their injection pressures. Further, he believed dry fly ash would plug the borehole, that the injection of air into the mine might feed the fire much like a forge, and that injecting fly ash under pressure would cause the fly

ash to dissipate as dust. It was not until after the demonstration in July and, to some extent, after some Bureau experiments in October, that Magnuson was satisfied that none of these beliefs was correct.

Since the characteristics of dry fly ash, the mixing of air with fly ash, and the formation of a fly-ash barrier are all aspects of the claimed invention, the foregoing would suggest that whatever answer Magnuson believed Nagode's suggestion represented, it was substantially less than a firm conception of the process by which a pneumatic tanker could, when connected to a borehole, be operated to inject fly ash to extinguish a mine fire. At best, it would appear that Magnuson had a general, vague idea that a pneumatic tanker could be useful in fighting fires but the manner of using it, the specific process steps by which the desired result could be achieved, were not then perceived by him.

Other evidence in the record lends support to that conclusion. Magnuson's diary entry following his meeting with Nagode merely referred to Nagode's suggestion and nothing more. Thereafter, but prior to the meeting with Heavilon, Magnuson mentioned this subject to no one. This absence of any contemporaneous disclosure of the claimed process, when it allegedly was the answer to a difficult problem, raises substantial doubts that Magnuson went into the meeting with Heavilon with anything more than the generalized suggestion of Nagode that "if you can blow fly ash up, why can't you blow it down." This is further corroborated by his forthright admission that, both prior to and after the demonstration, he drew no conclusions as to what had happened to the fly ash once it was down in the mine.

█ Nor is the evidence satisfactory that Magnuson, even if possessed of the conception, communicated it to Heavilon. He testified that he had no recollection of this but believed that it would have been logical that he would have told

Heavilon he was interested in using pneumatic tankers to blow fly ash into a mine.[9] However, both Heavilon and Magnuson made written reports or notes shortly after their meeting. Magnuson's notes offer no indication of who raised the topic of pneumatic injection of fly ash but Heavilon's notes allocate the suggestion to himself. While the self-serving nature of these notes is apparent, yet they were made essentially contemporaneously with the meeting and long before any controversy had developed. They are, therefore, entitled to some weight. Cf. Pacific Far East Line, Inc. v. United States, 394 F.2d 990, 184 Ct.Cl. 169 (1968).

In support of its derivation defense, defendant places great stress on the fact that the meeting was initiated by Magnuson, not Heavilon; the superior knowledge of Magnuson in the field of mine-fire control; and the fact that only Magnuson had knowledge of Nagode's earlier suggestion.

That Magnuson is a thoroughly competent and highly respected mining engineer with long experience in the field of mine-fire control is undisputed. Nor is it disputed that Heavilon had no prior experience with mine fires. However, Heavilon had the superior knowledge as to dry fly ash, its characteristics when aerated, and the method of operation of the trucks used to transport and inject the fly ash. While logic, applied to the facts with the benefit of hindsight, may suggest that the one endowed with the greater knowledge would be the more likely to have originated an idea, the instances where the experts have been confounded, see, e. g., United States v. Adams, supra, are too frequent to rely too heavily on logic to establish the fact. Here, the pertinent knowledge was partially held by each so the knowledge factor is an ambiguous one at best.

Nor does the fact Magnuson initiated the meeting necessarily confirm a prior conception. That Magnuson sought the meeting to learn more about pneumatic

---

9. In his invention disclosure report submitted to the Department of the Interior, Magnuson stated that he first communicated the idea to others in July 1967, a date subsequent to his meeting with Heavilon.

trucks is clear but the question remaining unanswered by the evidence is as to why he wanted the information and to what use he intended to put the trucks. Was it for the purpose of pneumatically injecting fly ash in accordance with the claimed method? Or was he seeking information simply as a first step in a general evaluation of how these trucks might be useful in connection with his work? Or did he contemplate that the trucks, with their long hoses, would provide a possible way for delivering the fly ash directly to the borehole for the water-flushing operation, thereby eliminating the double-handling of the fly ash theretofore required? The evidence, even when considered in light of Magnuson's knowledge of Nagode's suggestion, does not point to any particular conclusion but, rather, supports in varying degrees each one of them.

In the absence of clear testimony by Magnuson as to a specific prior conception, the absence of corroboration either by any witness or by any document as to the fact of such a conception, and in view of the doubts, concerns, and lack of specific information he possessed, it is concluded that defendant has failed to sustain its burden of proving either a prior conception by Magnuson or a communication of that conception to Heavilon.

The second branch of defendant's attack on inventorship is that Magnuson, if not the prior inventor, was a joint inventor either "with Nagode and/or Cutlip, or with Heavilon, Thomas, and/or Jones."[10]

Where more or less than the true inventors are named, the patent is void. Iowa State University Research Foundation, Inc. v. Sperry Rand Corp., 444 F.2d 406, 408 (4th Cir. 1971). However, misjoinder and nonjoinder of inventors are technical defenses requiring clear and convincing evidence. Garrett Corp. v. United States, *supra,* 422 F.2d at 880, 190 Ct.Cl. at 869. A claim of

coinventorship is also viewed with skepticism and requires clear and convincing evidence. Acme Highway Products Corp. v. D. S. Brown Co., *supra;* Mueller Brass Co. v. Reading Industries, *supra*; Layne-New York Co. v. Allied Asphalt Co., 363 F.Supp. 299 (W.D.Pa.1973), rev'd on other grounds, 501 F.2d 405 (1974).

Since the chain of events leading up to plaintiff's filing of its patent application commenced with the Magnuson-Heavilon meeting, the coinventorship argument is, at first blush, an appealing one. However, acceptance of that conclusion requires suppositions and assumptions that are not supported by the testimony of either participant.

The difficulty in finding Magnuson to be a coinventor is essentially the same as that encountered with the derivation defense. There is simply insufficient evidence as to what Magnuson may have contributed. If anything, the evidence would suggest that he may have passed along Nagode's comment to Heavilon. Of course, that would, at best, make Nagode, not Magnuson, a coinventor.

Nor does the fact that Heavilon and Magnuson agreed to conduct a test dictate a conclusion of joint inventorship. When Magnuson left the meeting, it was his understanding that a test would be conducted in which plaintiff would supply one load of fly ash and demonstrate that it could be injected pneumatically down a borehole without plugging the hole. But the fact of their agreement to conduct a test of that character does not resolve the issue of their respective contributions; nor does it clearly indicate that during and after this meeting, and through their united efforts and mutual contributions, Monsanto Co. v. Kamp, 269 F.Supp. 818 (D.D.C.1967), there evolved the claimed invention.

The facts are simply that Magnuson and Heavilon agreed to conduct a test and that Magnuson selected a site and prepared a fitting to permit attachment of plaintiff's trucks to the borehole cas-

---

10. Although a party may plead alternatively and inconsistently, the multiple theories of inventorship advanced by defendant in this case tend to confirm the lack of clear and convincing evidence in the record to support any one theory.

ing. To read into or infer from those facts any particular contribution by Magnuson to the *claimed* process is singularly inappropriate when even Magnuson offered no substantial testimony beyond those facts.

■ It is concluded that the proofs are insufficient to establish Magnuson as a coinventor. Layne-New York Co. v. Allied Asphalt Co., *supra.*

■ The same problem, insufficient proof, is present with the third branch of defendant's attack on inventorship, which is that Thomas and Jones were improperly joined as inventors with Heavilon.

There is no question but that, as among the three named inventors, Heavilon had the basic idea of pneumatically injecting dry fly ash to seal off the fire. However, after his meeting with Magnuson, Heavilon was uncertain as to what would happen to the fly ash, once it was down in the mine, and had reservations about the efficacy of the process. While Heavilon possessed an idea that encompassed the manipulative step of connecting a pneumatic tanker to a borehole extending into a mine cavity, it has not been shown that this idea extended to all aspects of the claimed process. Rather, the record indicates that it was not until the subsequent meeting with Thomas and Jones that the process was thought through, both as a fire-control technique and as a surface-subsidence measure. Matters such as the lateral travel of the fly ash in the mine, its bulking characteristics when wet, the size, carbon content and angle of repose of fly ash, and injection pressures to use in injecting the fly ash, were discussed by the three men. All of these matters are pertinent, in some degree, to a perception of how fly ash can be injected to achieve the desired results.

In view of this, it cannot be found by clear and convincing evidence that Thomas and Jones contributed nothing

to the final conception of the method as it is expressed in the claims of the patent. *See,* Mueller Brass Co. v. Reading Industries, *supra* at 1372.

## LICENSE

Finally,[11] defendant argues that it is entitled to a nonexclusive, royalty-free right to practice the patented method by reason of the contributions made by its personnel and the use of its facilities during the demonstration on July 19, 1967.

Plaintiff had no contract with defendant for any aspect of that demonstration, and there was no "close and umbilical connection," Mine Safety Appliances Co. v. United States, 364 F.2d 385, 176 Ct.Cl. 777 (1966), with any work being done under a Government contract. Nor are there any facts from which it might be concluded that the parties were involved in a joint venture. *Compare,* Technical Development Corp. v. United States, 202 Ct.Cl. 237 (1973), cert. denied, 416 U.S. 983, 94 S.Ct. 2384, 40 L.Ed.2d 759 (1974).

■ Plaintiff received no compensation from defendant. The expense of the demonstration was almost entirely borne by plaintiff, the only cost to defendant being a fitting it fabricated so that the hoses on plaintiff's trucks could be connected to the pipes in the boreholes. These facts, together with the absence of any contractual relationship, readily distinguish this case from Ordnance Engineering Corp. v. United States, 68 Ct.Cl. 301 (1929), cert. denied, 302 U.S. 708, 58 S.Ct. 28, 82 L.Ed. 547 (1937).

The license defense cannot be sustained.

In summary, it is concluded that claim 1 is valid and infringed, that defendant has no license to use the invention defined therein, and that plaintiff is entitled to recover reasonable and entire compensation for such use.

---

11. The defense of unenforceability, premised on fraud on the Patent Office, has not been established, Layne-New York Co. v. Allied As-

phalt Co., *supra*; Mueller Brass Co. v. Reading Industries, *supra*, and merits no comment. See finding 31.