106 F.3d 976
 41 U.S.P.Q.2d 1782
 Robert L. HESS, Plaintiff-Appellant,
v.
ADVANCED CARDIOVASCULAR SYSTEMS, INC., Defendant-Appellee.
ADVANCED CARDIOVASCULAR SYSTEMS, INC.,
Plaintiff/Cross-Complainant Defendant-Appellee,
v.
SCIMED LIFE SYSTEMS, INC., Defendant,
and
Robert L. Hess, Cross-Complainant/Appellant.
 No. 96-1066.
 United States Court of Appeals,
Federal Circuit.
 Feb. 18, 1997.
 
 Keith V. Rockey, Dressler, Rockey, Milnamow & Katz, Ltd., Chicago, IL, argued for plaintiff-appellant and cross-complainant/appellant. With him on the brief was Kathleen A. Lyons.
 Craig B. Bailey, Fulwider Patton Lee & Utecht, Los Angeles, CA, argued for defendant-appellee and plaintiff/cross-complainant defendant-appellee. With him on the brief were Richard A. Bardin and Paul M. Stull. Of counsel on the brief was Mark B. Mondry, Advanced Cardiovascular Systems, Inc., Santa Clara, CA.
 Before NEWMAN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and MICHEL, Circuit Judge.
 FRIEDMAN, Senior Circuit Judge.
 
 
 1
 This appeal challenges the decision of the United States District Court for the Northern District of California that the materials and suggestions the appellant Robert L. Hess provided to the listed inventors of a patent did not make him a co-inventor of the patented device. We affirm.
 
 I.
 
 2
 A. United States Patent No. 4,323,071 (the '071 patent), which listed Drs. John B. Simpson and Edward W. Robert as the inventors, covers a balloon angioplasty catheter that is inserted into a patient's artery which has a partial blockage, or stenosis. The balloon, fitted to the catheter, is inflated by forcing a radiographic fluid into it under pressure; the resulting expansion of the balloon eliminates or reduces the blockage of the artery.
 
 
 3
 While developing the catheter, Drs. Simpson and Robert were postdoctoral Cardiology Fellows at Stanford University Medical Center. A Swiss physician, Dr. Gruntzig, had pioneered the development of balloon angioplasty. After hearing Dr. Gruntzig speak at a cardiology conference at Stanford in March 1977 and later meeting him, Dr. Simpson spent time with Dr. Gruntzig in Europe, observing him perform balloon angioplasty procedures.
 
 
 4
 Upon returning to the United States Dr. Simpson discovered that Gruntzig catheters, made only in Switzerland, were in short supply. Drs. Simpson and Robert then decided to construct their own catheter. They had not examined the Gruntzig catheter in detail, but knew it had a balloon mounted on a shaft.
 
 
 5
 In attempting to find a material from which a balloon could be made, the doctors first experimented with a plastic called polyvinylchloride, which was ineffective, and next tried Teflon tubing, which produced unsatisfactory balloons. One of their Stanford colleagues (Bill Sanders) then referred them to the appellant Mr. Hess, an engineer at Raychem Corporation. At that time Mr. Hess was a technical liaison between Raychem's domestic and foreign operations; prior to that he had headed a business development group. Sanders made the suggestion because Raychem was one of the largest manufacturers of heat shrinkable materials and "might have some material" with which they could work.
 
 
 6
 The doctors told Mr. Hess, who had no previous experience with angioplasty, about the Gruntzig catheter. They stated they "wanted to ... build a catheter ... that incorporated a balloon on the end of a shaft." They explained what they were attempting to do, the problems they had encountered in finding a suitable material for the balloon, and that they were looking for a new material. They stated that the materials they had tried did not enable them properly to control balloon expansion.
 
 
 7
 Mr. Hess suggested that the doctors try Raychem's heat shrinkable irradiated modified polyolefin tubing and demonstrated how such a material could be used to form a balloon by heating the tubing above its crystalline melting point, applying pressure, and then cooling the material. Mr. Hess also suggested the use of an adhesive-free seal to attach the balloon to the catheter. He described how one end of the tubing could be shrunk fit onto the central shaft of the catheter without the use of any potentially-toxic adhesive chemicals. Mr. Hess stated that "the basic principles which I taught them"--involving heating the tubing "above its crystalline melting point, expanding it while it remains heated using internal pressure and then cooling it in its expanded state while your [sic] maintaining the pressure"--were "in various published textbooks and the like" and "was a generally known process to a number of companies."
 
 
 8
 Mr. Hess provided "multiple samples of ... tubing," with which the doctors "experimented." At that meeting and in further discussions with the doctors, Mr. Hess also suggested "approaches to construction of the catheter" using the Raychem tubing.
 
 
 9
 Using that tubing, Drs. Simpson and Robert then developed and built their catheter. They had "difficulty ... developing the ... catheter" and spent "hours and days trying to configure this system to make it work," including "experimentation ... with the tubing" Mr. Hess "gave" them. The two doctors worked on the catheter "virtually every day [for] four or five hours or more." The doctors finally developed the balloon using a technique called free-blowing, a technique which Mr. Hess admittedly did not suggest. Pursuant to Mr. Hess's suggestion, the doctors attempted to avoid the use of adhesives and shrink fit the balloon to the catheter shaft, but they encountered leakage problems. Without Mr. Hess's assistance and after further experimentation, the doctors ultimately developed an acceptable adhesive-free seal. Mr. Hess did not participate in the day-to-day experimentation.
 
 
 10
 The doctors applied for a patent on their catheter in April, 1978 and the '071 patent issued with twenty-one claims (the "original claims") in April, 1982. The two inventors organized the appellee company Advanced Cardiovascular Systems, Inc. (ACS), to which they assigned the '071 patent, and began manufacturing and selling the catheter. An ACS officer stated that the "catheter gained widespread success in the marketplace, and sales of the product grew rapidly," and that the Simpson-Robert catheter "was profitable" to ACS. Raychem supplied ACS with tubing for manufacturing the catheters.
 
 
 11
 B. In 1987, ACS sued SciMed Life Systems, Inc. (SciMed) in the United States District Court for the District of Minnesota for infringement of the '071 patent. The district court granted SciMed's motion for summary judgment of non-infringement, based on its interpretation of the claims. This court, however, vacated and remanded, rejecting the district court's claim interpretation. Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 887 F.2d 1070, 12 USPQ2d 1539 (Fed.Cir.1989).
 
 
 12
 The question of Mr. Hess's alleged co-inventorship apparently first arose when in its answer SciMed asserted, as one ground for challenging the validity of the patent, that there was a "failure of the patentees to join Hess as a co-patentee." In a declaration Mr. Hess executed in 1988, which SciMed filed in the patent infringement case, he described the aid he had given to Drs. Simpson and Robert in connection with the development of their catheter. In a 1990 affidavit, he repeated those statements and asserted that he "made substantive contributions to the subject matter disclosed" in the '071 patent and "should be named as a co-inventor thereof."
 
 
 13
 In September, 1987, ACS requested reexamination of certain claims in the '071 patent. In May 1990, the Patent and Trademark Office issued a reexamination certificate, which upheld the original claims and added claims 22-52 (the "reexamination claims").
 
 
 14
 In the summer of 1990, Mr. Hess intervened in the ACS-SciMed suit to file a cross-complaint against ACS seeking a declaration that he was a joint inventor of the catheter the '071 patent covered and seeking correction of the patent to reflect his status. The district court dismissed Mr. Hess's cross-complaint for failing to state a claim on which relief could be granted because the complaint was barred by laches. This court vacated the dismissal and remanded, holding that there were disputed issues of material fact with respect to laches that precluded dismissal. Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc., 988 F.2d 1157, 26 USPQ2d 1038 (Fed.Cir.1993).
 
 
 15
 While that appeal was pending, Mr. Hess filed suit in United States District Court for the Northern District of California against ACS, alleging that he was a co-inventor of the catheter the reexamination claims covered.
 
 
 16
 On the eve of trial ACS and SciMed settled their infringement suit. The Minnesota District Court then transferred to the Northern District of California Court the remaining portion of the case, which was Mr. Hess's cross-complaint asserting his co-inventorship of the catheter the '071 patent covers. The California District Court consolidated the two cases.
 
 
 17
 The California District Court granted summary judgment that Mr. Hess's claim of coinventorship of the catheter the original claims covered was barred by laches, and set for trial the co-ownership issue with respect to the reexamination claims.
 
 
 18
 After a bench trial, the district court held that the evidence did not establish Mr. Hess's claim of co-inventorship of the catheter the reexamination claims covered. Ruling from the bench, the court determined that Mr. Hess was required to prove co-inventorship by clear and convincing evidence. The court stated:
 
 
 19
 [A]ll that Mr. Hess needs to establish is that he conceived some important element or some important claim that is claimed in the patent....
 
 
 20
 ....
 
 
 21
 ... I don't think it's necessary for Mr. Hess to conceive of every feature of the catheter, but that he have some conceptual role in at least an important or a necessary element, or important and necessary claim.
 
 The court noted:
 
 22
 [I]nventors can obtain the services and ideas and product of others without losing their exclusive right to ownership....
 
 
 23
 ....
 
 
 24
 So merely that Mr. Hess was consulted, Mr. Hess made some contribution, doesn't in and of itself rise to the level of conception particularly if he's doing nothing more than explaining to the inventors what the then state of the art was and supplying a product to them for use in their invention.
 
 The court found that
 
 25
 the information provided by Mr. Hess really didn't rise to the level of conception; that most, if not all, of his discussion with them were [sic] telling them what was available in the marketplace by way of product, and telling them how the product worked, and they, that is, Simpson and Robert, were the ones who used the product or used the--yes, used the product provided in their work.
 
 
 26
 ....
 
 
 27
 [W]hen they were meeting with Mr. Hess, I think what Mr. Hess was doing was showing them available product, telling them its properties, telling them how it could be used, and how it might be used.
 
 
 28
 ... Raychem became a supplier of product to Simpson and Robert, really all of which really leaves [sic] me to the conclusion that Mr. Hess' role was really as a representative of Raychem who is making available to a customer or potential customer the product that Raychem has, and its property uses and adaptation to what the inventors here wanted to do.
 
 
 29
 ....
 
 
 30
 [I]t's [sic] also clear from the record that Mr. Hess didn't know anything about angioplasty or medical catheters until discussion with Dr. Robert and Dr. Simpson.
 
 Finally, the court stated:
 
 31
 I do wish to state for the record that on a factual basis after having heard the evidence in the case, I'm also concluding that the evidence did not establish coinventorship of the original claims in the '071 patent and not just the reissue claims for that patent.
 
 
 32
 Hess v. Advanced Cardiovascular Sys., Inc., No. C-92-1956 (N.D.Cal. Feb. 3, 1995).
 
 II.
 
 33
 The patent laws provide that whoever "invents" patentable subject matter is entitled to a patent thereon, 35 U.S.C. § 101 (1994), and that when an "invention" is "made by two or more persons jointly, they shall apply for [a] patent jointly." 35 U.S.C. § 116 (1994). The statute also deals with the situation where an inventor is not named in the application or the issued patent. 35 U.S.C. §§ 116, 256 (1994). Section 256 provides that if "through [inadvertent] error an inventor is not named in an issued patent ... the Commissioner [of Patents] may ... issue a certificate correcting such error," and that "[t]he court ... may order correction of the patent ... and the Commissioner shall issue a certificate accordingly."
 
 
 34
 The district court held that Mr. Hess had to prove his claim of co-inventorship by clear and convincing evidence, and that Mr. Hess had not done so. Mr. Hess challenges both of these rulings.
 
 
 35
 A. As the Court of Claims (whose decisions bind us, South Corp. v. United States, 690 F.2d 1368, 1370, 215 USPQ 657, 658 (Fed.Cir.1982) (in banc)) stated in Garrett Corp. v. United States, 190 Ct.Cl. 858, 422 F.2d 874, 880, 164 USPQ 521, 526, cert. denied, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970), "[t]he burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence." Although the case involved section 116, which governs patent applications, and the present case involves section 256, which covers issued patents, the pertinent statutory language is virtually identical, and the burden of proof on this issue is the same under both sections. See 1 Donald S. Chisum, Patents § 2.03(4) at 2-31 (1996).
 
 
 36
 The rule rests on important policy considerations. "The inventors as named in an issued patent are presumed to be correct." Amax Fly Ash Corp. v. United States, 206 Ct.Cl. 756, 514 F.2d 1041, 1047, 182 USPQ 210, 215 (1975). As the court there stated, in holding that one claiming that the inventor listed in the patent derived the invention from the claimant's work must show derivation by clear and convincing evidence, "the temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier, is simply too great to permit a lower standard." Id. at 1047, 182 USPQ at 215 (footnote omitted). This language is similarly applicable to claims of co-inventorship made after a patent has been issued--particularly where, as here, the patent has been outstanding for a considerable time and the patented device has been successful. In that situation, too, there is an equally strong temptation for persons who consulted with the inventor and provided him with materials and advice, to reconstruct, so as to further their own position, the extent of their contribution to the conception of the invention. In these circumstances, it would be inappropriate to permit a lower standard than clear and convincing evidence.
 
 
 37
 Mr. Hess apparently suggests that because of the particular circumstances of his participation in the activities of Drs. Simpson and Robert, the proper evidentiary standard for determining his co-inventorship claim should be preponderance rather than clear and convincing. Once the standard of proof has been determined, however--and we have held that it is clear and convincing evidence for determining co-inventorship--it applies without regard to the circumstances of a particular case. Permitting the exception Mr. Hess urges could significantly undermine the designated standard of proof, since litigants always can assert, and sometimes effectively, that their cases involve special circumstances.
 
 
 38
 B. Mr. Hess concedes that the district court "articulat[ed] the appropriate test for inventorship." The district court's standard was whether Mr. Hess "conceived some important element or some important claim that is claimed in the patent," and whether he had "some conceptual role in at least an important or a necessary element, or important and necessary claim." Mr. Hess argues, however, that the court "completely misapplied" that standard "in finding that Hess's contributions were not inventive." This argument, however, is in reality only a reformulation of the contention that the district court's findings upon which the court based its conclusion that Mr. Hess had not established co-inventorship, are clearly erroneous.
 
 
 39
 We have carefully reviewed the evidence in the record. Although there is some conflict on the question of co-inventorship, the district court's findings that Mr. Hess was not a co-inventor of the catheter claimed in the '071 patent are not clearly erroneous.
 
 
 40
 When Drs. Simpson and Robert first met with Mr. Hess, he was totally unfamiliar with angioplasty catheterization and the problems it involved. They explained to him what they were trying to do, and what difficulties they encountered. He recommended a Raychem product that he believed would be suitable for making a balloon, showed them how a balloon could be formed by heating both ends of the tube (a procedure they did not use in making their patented catheter), and made other suggestions for making the catheter, using the Raychem tubing. Although the doctors followed and utilized some of Mr. Hess's suggestions in their extensive further research, testing and construction of their catheter, the district court justifiably concluded on this record that it was they, and not Mr. Hess, who actually conceived and made the patented invention and that Mr. Hess's contributions to the inventions did not constitute the conception necessary to establish co-inventorship.
 
 
 41
 More than 140 years ago the Supreme Court, in holding that Samuel Morse's discussions with scientists in connection with his invention of the telegraph did not alter his status of the sole inventor of that device, stated:
 
 
 42
 No invention can possibly be made, consisting of a combination of different elements ... without a thorough knowledge of the properties of each of them, and the mode in which they operate on each other. And it can make no difference, in this respect, whether [the inventor] derives his information from books, or from conversation with men skilled in the science. If it were otherwise, no patent, in which a combination of different elements is used, could ever be obtained.
 
 
 43
 O'Reilly v. Morse, 56 U.S. (15 How.) 62, 111, 14 L.Ed. 601 (1853).
 
 
 44
 Similarly, in Shatterproof Glass, this court stated that
 
 
 45
 [a]n inventor "may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent."
 
 
 46
 Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 624, 225 USPQ 634, 641 (Fed.Cir.1985) (quoting Hobbs v. United States Atomic Energy Comm'n, 451 F.2d 849, 864, 171 USPQ 713, 724 (5th Cir.1971)).
 
 
 47
 Mr. Hess relies on the following statement in the 1914 district court opinion in DeLaski & Thropp Circular Woven Tire Co. v. William R. Thropp & Sons Co., 218 F. 458, 464 (D.N.J., 1914), aff'd, 226 F. 941 (3d Cir.1915), which he describes as "the controlling legal standard."
 
 
 48
 The conception of the entire device may be due to one, but if the other makes suggestions of practical value, which assisted in working out the main idea and making it operative, or contributes an independent part of the entire invention, which is united with the parts produced by the other and creates the whole, he is a joint inventor, even though his contribution be of comparatively minor importance and merely the application of an old idea.
 
 
 49
 That language, of course, is not binding precedent in this court, and its focus appears inconsistent with the approach the Supreme Court took in Morse and this court took in Shatterproof Glass. In any event, whether particular suggestions and contributions of third persons amount to co-inventorship turns on the facts of the particular case.
 
 
 50
 Here the district court found that in his consultations with Drs. Simpson and Robert, Mr. Hess was "doing nothing more than explaining to the inventors what the then state of the art was and supplying a product to them for use in their invention"; that "most, if not all, of his discussion with them were [sic] telling them what was available in the marketplace by way of product, and telling them how the product worked"; and that "what Mr. Hess was doing was showing them available product, telling them its properties, telling them how it could be used, and how it might be used." The principles Mr. Hess explained to them were well known and found in textbooks. Mr. Hess did no more than a skilled salesman would do in explaining how his employer's product could be used to meet a customer's requirements. The extensive research and development work that produced the catheter was done by Drs. Simpson and Robert. Our review of the record satisfies us that those findings are not clearly erroneous, and that they support the district court's conclusion that whatever contribution Mr. Hess made to Drs. Simpson and Robert did not constitute conception and therefore did not make Mr. Hess a co-inventor of the catheter claimed in the '071 patent.
 
 
 51
 Mr. Hess relies on snippets of the doctors' testimony in which, he asserts, the doctors conceded that Mr. Hess was responsible for significant portions of the invention the '071 patent disclosed. Those statements, however, cannot bear the weight Mr. Hess gives them. In the context of the entire record, they do not refute the factual sufficiency of the evidence supporting the district court's decision.III.
 
 
 52
 Mr. Hess also argues that the district court erroneously dismissed on summary judgment, as barred by laches, that portion of his case that claimed co-inventorship of the invention disclosed in the original claims. That issue, however, is moot in view of the district court's ruling that "on a factual basis after having heard the evidence in the case, I'm also concluding that the evidence did not establish coinventorship of the original claims in the '071 patent and not just the reissue claims for that patent." Accordingly, we do not consider it.
 
 CONCLUSION
 
 53
 The judgment of the district court that Mr. Hess has not established his claim to co-inventorship of the catheter disclosed in the '071 patent is
 
 
 54
 AFFIRMED.