88 F.Supp.2d 1009 (2000)
WHITESIDE BIOMECHANICS, INC., Plaintiff,
v.
SOFAMOR DANEK GROUP, INC., Danek Medical, Inc. and SDGI Holdings, Inc., Defendants.
No. 4:96CV2195-DJS.
United States District Court, E.D. Missouri, Eastern Division.
March 21, 2000.
*1010 William B. Cunningham, Jr., McPherson D. Moore, Polster and Lieder, St. Louis, MO, James W. Whitney, Jr., William T. Burnet, Menees and Whitney, Clayton, MO, for Whiteside Biomechanics, Inc.
Frank B. Janoski, Benjamin A. Lipman, Keith J. Grady, Robert P. Berry, Lewis and Rice, St. Louis, MO, for Danek Medical, Inc., SDGI Holdings, Inc.

ORDER AND MEMORANDUM OPINION
STOHR, District Judge.

Procedural Posture of the Case
Plaintiff's second amended complaint asserts five claims against all three named defendants, as follows:

Count I: breach of common law duty

Count II: unfair competition

Count III: misappropriation of trade secrets

*1011 Count IV: misappropriation of trade secrets through acquisition by improper wrongful means and breach of confidence

Count V: correction of inventorship of three patents.
Defendant SDGI Holdings, Inc. filed a six-count counterclaim in response:

Count I: patent infringement

Count II: correction of inventorship of a patent

Count III: breach of common law duty

Count IV: unfair competition

Count V: misappropriation of trade secrets

Count VI: misappropriation of trade secrets through acquisition by improper wrongful means and breach of confidence.
Count I of the counterclaim was dismissed on February 2, 1999 without prejudice to its assertion in a separate action then pending in this Court. SDGI voluntarily dismissed Counts III through VI of its counterclaim on March 1, 1999. The remaining jury-triable claims were tried for ten days from March 1 to March 12, 1999. At the close of the trial, plaintiff was permitted to voluntarily dismiss its claims against defendant Sofamor Danek Group, Inc. without prejudice, over defendant's objection. The sole claim submitted to the jury was Count III of the second amended complaint, plaintiff's claim of misappropriation of trade secrets, and as against defendant Danek Medical, Inc. only.[1] On that claim, the jury returned a verdict in plaintiff's favor, assessing actual damages at $687,797.74, and awarding no punitive damages. On March 19, 1999, plaintiff filed motions seeking assignment of certain of defendants' patents and for other injunctive relief. Both parties' claims for correction of inventorship and plaintiff's motions seeking other equitable relief were reserved to the Court, and were the subject of a separate non-jury hearing on March 23, 1999.

Newly-Discovered Evidence
On August 25, 1999, with the non-jury issues still under advisement, defendants Danek Medical, Inc. and SDGI Holdings, Inc. filed a motion seeking leave to adduce newly discovered evidence for the Court's consideration on the non-jury issues and in support of a renewed motion for judgment as a matter of law reversing the jury's verdict on the misappropriation claim. The briefing of that motion was completed on November 8, 1999.
The parties have largely avoided discussion of the procedural ramifications of the motion, a significant subject which the Court treats as a threshold issue. As noted above, the relief the motion seeks is two-fold. First, movants seek to reopen the record to permit the Court's consideration of the newly-discovered evidence in connection with the non-jury issues which have not yet been decided by the Court. Second, and also on the basis of the newly-discovered evidence, movants ask the Court to set aside the jury's verdict and enter judgment in Danek Medical's favor on the misappropriation claim. The impropriety and unavailability of the second species of relief has a considerable impact on the propriety and availability of the first.
In a jury-tried case, if under applicable standards newly discovered evidence is deemed to warrant a remedy, the available remedy is a new trial, not judgment as a matter of law. Movants in effect ask the Court to reweigh the record, expanded to include their new evidence, and issue its own determination in place of the jury's verdict. But plaintiff exercised its right to jury trial on the misappropriation claim. The jury's role of weighing and sifting the evidence cannot be usurped by the Court on the basis of newly discovered evidence, even if the fullest possible evidentiary hearing were conducted, offering the opposing party every opportunity to crossexamine, *1012 impeach and rebut the newly proffered evidence. The impropriety of the Court substituting its judgment for that of the jury is inherent in the standard for granting judgment as a matter of law ("JAML"), relief which is available only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party[.]" Fed.R.Civ.P. 50(a). Such a standard clearly implies that JAML depends more on the weakness of the plaintiff's case than the strength of the defendant's, however much it is claimed to be recently improved by newly discovered evidence.
Contrary to movants' suggestion that the newly discovered evidence is controlling, the result movants seek requires a weighing of evidence. Even on paper, plaintiff is quick to respond to movants' proffer of new evidence with assertions which a jury might find to weaken or negate the impact of defendants' evidence. Such a weighing is beyond the Court's purview in ruling on a motion for judgment as a matter of law. The Eighth Circuit has so taught, even more than thirty years ago:
There is a difference in the function of a judge when he is ruling on a motion for a directed verdict or a judgment n.o.v. and when he passes on a motion for a new trial. In the former instance, it is his duty to accept the plaintiff's version as true for the purposes of the motion, notwithstanding the existence of strong testimony to the contrary; the judge is not concerned with the weight of the evidence. On the motion for new trial, however, he has wider, though not unlimited, latitude and he may set the verdict aside where it is against the weight of the evidence, or to prevent injustice. The standard applicable to consideration and disposition of a motion for a directed verdict or for a judgment n.o.v. is whether plaintiff's evidence is sufficient to support a burden, ignoring defendant's evidence.
Simpson v. Skelly Oil Company, 371 F.2d 563, 567 (8th Cir.1967) [internal citations omitted]. Applying the same standard to JAML as the successor to the JNOV, the Eighth Circuit has held:
We must consider the evidence in the light most favorable to [plaintiff], assume all conflicts in the evidence were resolved in [plaintiff's] favor, assume [plaintiff] proved all facts that his evidence tended to prove, and give [plaintiff] the benefit of all favorable inferences that reasonably may be drawn from the proven facts. To prevail on its motion for JAML, [defendant] has the difficult task of demonstrating that all the evidence points in [its] direction and is susceptible of no reasonable interpretation sustaining [plaintiff's] position.
Morse v. Southern Union Company, 174 F.3d 917, 922 (8th Cir.1999) [internal citations omitted]. See also Blackmon v. Pinkerton Security, 182 F.3d 629, 635 (8th Cir.1999). All these principles preclude the second species of relief movants seek, namely a Court-imposed judgment in Danek's favor on the jury-tried claim, regardless of the potential significance of the newly proffered evidence.
That being the case, the first species of relief is also precluded. In the Court's view, it is inappropriate and impermissible for the Court and jury to render judgments on the equitable and legal issues in the same case based on different records, except as the records might differ based on the limited relevance of particular evidence. The Court held a separate evidentiary hearing on the non-jury issues, for the very purpose of taking evidence which was relevant only to those issues of equitable relief. The evidence now offered by movants is not such evidence, but instead is equally relevant to the central issues of plaintiff's right to legal relief on the claim of misappropriation. The potential anomaly of the jury record supporting its finding that Danek misappropriated plaintiff's trade secret, but an expanded non-jury record being found to support the contrary conclusion, is not to be permitted.
The Court's conclusions concerning the newly discovered evidence can be summarized *1013 as follows. Judgment as a matter of law reversing the jury's verdict is not an available remedy based on newly discovered evidence. Having decided that the newly proffered evidence cannot be considered against the jury's verdict, and no new trial of the jury claim having been sought, the Court deems it inappropriate to consider the new evidence in its determinations as to equitable relief. For these reasons, movants' failure to seek a new trial requires the motion to be denied, quite without regard to the more substantive question whether the newly discovered evidence would warrant a new trial, a question on which the Court at this time need not and does not express any opinion. In view of this disposition of the motion, and in any event consistent with the Court's desire to preserve a full record on the matter, the Court will deny plaintiff's motion to strike defendants' reply in support of their motion to submit newly discovered evidence, and will grant defendants' motion for leave to file the affidavit of Gordon Carlson.

MEMORANDUM OPINION ON NON-JURY ISSUES
The Court next turns to the non-jury matters before it for decision. First is the issue of correction of inventorship of patents, a species of relief sought by plaintiff in its Count V and SDGI in Count II of its counterclaim. The second of the three equitable determinations before the Court is reassignment of patents. The third is injunctive relief sought by plaintiff barring defendants from making or selling surgical cables with an integral crimp for a period of two years and four months, the period of time by which defendants' production of such cables was allegedly advanced by its misappropriation of plaintiff's trade secrets.

I. Findings of Fact

The jury's verdict in plaintiff's favor on the misappropriation claim necessarily implies certain findings of fact. As instructed, the jury could return a verdict in plaintiff's favor only by finding that trade secrets existed, that Danek Medical acquired those secrets as a result of a confidential relationship and then used the secret information without authorization from plaintiff. Consistent with the jury's verdict, and only as necessary to support its conclusions concerning equitable relief, the Court here supplements those findings.
1. Plaintiff Whiteside Biomechanics, Inc. is a biomedical research laboratory operated by Dr. Leo Whiteside, an orthopedic surgeon who is a named inventor on over 20 patents relating to orthopedic devices.
2. Defendant Danek Medical, Inc. manufactures orthopedic surgical devices and instruments.
3. As of the early 1990's, several orthopedic surgical systems existed using cable to band bone to itself or to surgical implants of various kinds. Various means had been used to fasten the cable once looped about the structures to be banded together.
4. By 1991, Dr. Whiteside was familiar with the Songer Cable System, developed and sold by defendant in conjunction with a Dr. Matthew Songer. The Songer system used a crimp threaded onto the cable and crushed onto it to hold the cable loop in place. The small crimps of the Songer system had to be threaded onto the cable during surgery. Dr. Whiteside perceived that the loose crimps were difficult for the gloved surgeon to handle, and posed a danger of being dropped into the surgical incision.
5. Contemplating solutions to the problem of the loose crimp, Dr. Whiteside made a number of sketches in his lab notebook, dated August 17, 1991, with the following notations:
Swedged-on crimping mechanism
Allows surgeon to handle cable not drop crimp
Cable passes through a swedged-on ferrell or "crimp."
Cable is swedged on to cable.

*1014 End of cable is passed through swedged on crimp & tightened c tightener. Eliminates steps of handling crimp (ferrell).
(Attached as Court's Exhibit 1.)
6. A second page of sketches from Dr. Whiteside's notebook, dated August 19, 1991 contains the notation "Swedged-on crimping mechanism." (Attached as Court's Exhibit 2.)
7. By the term "swedged," Dr. Whiteside meant that, in manufacturing, the cable could be threaded through a hole in the crimp and the metal of the crimp crushed around the cable to attach the two structures.
8. Steve White is a biomedical engineer who was employed by plaintiff in 1991 and 1992. Based on Dr. Whiteside and White's discussions and ideas for preattaching cable and crimp, White contacted defendant Danek Medical, Inc. about developing an improved surgical cable product together. At the same time, Danek arranged to pay plaintiff a fee to test and evaluate another device, cervical plates used in neck surgery.
9. On April 1, 1992, Michael Sherman and Brad Coates of Danek Medical, Inc. traveled to St. Louis, Missouri from Memphis, Tennessee to meet with Dr. Whiteside and Steve White. Coates' involvement in the meetings was limited to the discussions concerning the testing of the cervical plates.
10. During the April 1, 1992 visit, Dr. Whiteside and Steve White met with Michael Sherman to discuss their ideas for improving upon the surgical cable systems then existing. Among these ideas was the manufacturing of a cable with a swedged-on crimp shipped as a single unit from the factory. Dr. Whiteside showed Michael Sherman the August 17 and August 19, 1991 pages from his lab notebook referred to above.
11. During the April 1, 1992 meeting between Whiteside, White and Sherman, Steve White made a number of sketches on a pad of paper to illustrate the concepts being discussed. At the center top of this sheet, White sketched a design for a crimp shaped like a top hat with two brims. This page of sketches was signed by Dr. Whiteside and Steve White at the meeting, and the date notation "4/1/92" appears next to White's signature. (Attached as Court's Exhibit 3.)
12. The Songer Cable System's crimp was shaped like a top hat. Prior to the meeting, Dr. Whiteside had contemplated attaching the crimp to the cable by pushing a top hat shaped crimp up through a loop at one end of the cable. In discussion on April 1, 1992, Dr. Whiteside described this idea and the observation was made that such a crimp could fall back out of the loop. Steve White drew the double brim top hat design to illustrate his concept for preventing the crimp from slipping out with a second "brim," and of preattaching the cable by looping it around the crimp between the two "brims" and fastening the looped cable to itself by means of a separate crimp.
13. Sherman's June 17, 1992 letter to Dr. Whiteside confirmed defendant's inability to proceed with another of Dr. Whiteside's ideas but expressed the following concerning the preattached crimp idea: "We do, however, believe your concept for modifying and improving the Songer Cable System for spinal applications is excellent, and we hope to be incorporating your ideas into future designs. As this becomes a reality, we will be contacting you to discuss the details of a formal agreement."
14. By the fall of 1992, because defendant did not appear to be moving forward on a new cable system per plaintiff's suggestions, White and Whiteside began considering approaching another company or developing the product on their own.
15. After a chance meeting in December 1992 between Dr. Whiteside and David Miller, Danek's Director of Specialty Services, Dr. Whiteside wrote Miller a letter dated December 22, 1992, in which he expressed disappointment with the pace of defendant's progress and his intention to patent the idea on plaintiff's own.
*1015 16. Miller responded with a letter dated January 12, 1993, in which he refers to "your idea of a crimp that can be incorporated into the cable design" and explained that defendant's "caution and thorough evaluation" did not indicate lack of interest. Miller indicated that he and John Pafford, also of Danek Medical, Inc., would like to visit Dr. Whiteside to begin "preliminary business discussions."
17. Miller and Pafford came to St. Louis in early February 1993. Dr. Whiteside rejected as insufficient their offer of a royalty arrangement. This signaled the end of the parties' collaborative effort to design and market an improved cable system. Plaintiff's independent efforts thereafter focused on the double brim top hat design, and later on a low-profile tubular macaroni-shaped crimp design.
18. Through the person of Michael Sherman and via disclosures made by Steve White and Dr. Leo Whiteside at the April 1, 1992 meeting of those three persons, Danek misappropriated plaintiff's concept of preattaching a crimp to a surgical cable assembly by means of swedging or crimping a portion of the crimp directly to the cable. As the jury implicitly found, the nature of the parties' dealings at that time imposed a duty of confidentiality on the disclosures made at the April 1, 1992 under the standard of the medical invention industry.
19. In 1994, defendant introduced its Danek Cable System, later called the ATLAS Cable System, featuring a crimp preattached by swedging to the surgical cable.
20. Defendants' Patent No. 5,423,820 ("the '820 patent"), filed July 20, 1993 and issued June 13, 1995, is for an L-shaped surgical cable and integral crimp. The named inventors are David F. Miller, Robert A. Farris and Bradley J. Coates, and the assignee shown on the patent is Danek Medical, Inc.
21. Defendants' Patent No. 5,395,374 ("the '374 patent"), filed September 2, 1993 and issued March 7, 1995, is for an "Orthopedic Cabling Method and Apparatus" in which a cable clamp with a lever-operated cam allows temporary fixation of the cable prior to final crimping. The named inventors are David F. Miller, Michael C. Sherman and Robert A. Farris. Danek Medical, Inc. is the assignee named on the patent.
22. Defendants' Patent No. 5,569,253 ("the '253 patent"), filed March 29, 1994 and issued October 29, 1996, is for a "Variable-Angle Surgical Cable Crimp Assembly and Method" and covers a swivel-mounted variable-angle crimp preattached to a surgical cable. The named inventors are Robert A. Farris and M. Jeffrey Bonner, and the assignee shown is Danek Medical, Inc.
23. Plaintiff's Patent No. 5,772,663 ("the '663 patent"), issued June 30, 1998 for a "Surgical Device for Banding Bone with Cable," covers a cable with a double-brim top hat shaped crimp preattached to the cable. The listed inventors are Leo A. Whiteside and Stephen E. White.
24. Claims of plaintiff's initial patent application, filed February 21, 1994, for the broad concept of preattachment between crimp and cable were rejected in part based on defendants' '374 patent.

II. Conclusions of Law

A. Correction of Inventorship

Count V of plaintiff's complaint seeks to have Dr. Whiteside and Stephen White added as co-inventors of defendants' '820, '374 and '253 patents. Correction of the named inventors in a patent is governed by 35 U.S.C. § 256, which authorizes correction by either the Director of the Patent and Trademark Office[2] or a federal court "before which such matter is *1016 called in question." Although courts had previously interpreted § 256 to apply only in instances of inadvertent error in the naming of inventors, the Federal Circuit decided otherwise:
[S]ection 256 allows deletion of a misjoined inventor whether that error occurred by deception or by innocent mistake. As well, the section allows addition of an unnamed actual inventor, but this error of nonjoinder cannot betray any deceptive intent by that inventor.

Stark v. Advanced Magnetics, Inc., 119 F.3d 1551, 1555 (Fed.Cir.1997) (emphasis added). No such deceptive intent on the part of Dr. Whiteside or Steven White is alleged. The statute's procedural prerequisites of notice and an opportunity to be heard have been satisfied by the proceedings before this Court. Id. at 1553.
An issued patent's statement of inventorship is presumed to be correct. Amax Fly Ash Corp. v. United States, 206 Ct.Cl. 756, 514 F.2d 1041, 1047 (1975), as quoted in Hess v. Advanced Cardiovascular Systems, Inc., 106 F.3d 976, 980 (Fed. Cir.1997); Fina Oil and Chemical Co. v. Ewen, 123 F.3d 1466, 1472 (Fed.Cir.1997). Proof of a claim of inventorship must therefore satisfy the clear and convincing standard, given "`the temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier'" and the "equally strong temptation for persons who consulted with the inventor and provided him with materials and advice to reconstruct, so as to further their own position, the extent of their contribution to the conception of the invention." Hess, 106 F.3d at 980, in part quoting Amax, 514 F.2d at 1047.
Furthermore, evidence corroborating the putative inventor's own testimony is required. Fina Oil, 123 F.3d 1466, 1474["[A] contribution to conception is a mental act which cannot be accurately verified without corroboration."]; Price v. Symsek, 988 F.2d 1187, 1194 (Fed.Cir. 1993). Examples of satisfactory corroborating evidence include contemporaneous documentary disclosure prepared by the alleged inventor, circumstantial evidence concerning the inventive process, and testimony by someone other than the putative inventor. Ethicon, Inc. v. United States Surgical Corporation, 135 F.3d 1456, 1461 (Fed.Cir.1998); Burroughs Wellcome, 40 F.3d at 1228.
Plaintiff does not and could not plausibly contend that White and Whiteside are the sole inventors for any of defendants' three patents here at issue. Rather than seek to supplant the named inventors with Dr. Whiteside and Stephen White, plaintiff seeks to have Whiteside and White added as co-inventors. Joint inventorship is contemplated by 35 U.S.C. § 116, which expressly provides that joint inventors need not "physically work together or at the same time," need not "make the same type or amount of contribution" and need not each "make a contribution to the subject matter of every claim of the patent."
The Federal Circuit has said that "[d]etermining `inventorship' is nothing more than determining who conceived the subject matter at issue[.]" Sewall v. Walters, 21 F.3d 411, 415 (Fed.Cir.1994). Both conception and inventorship are questions of law. Id. "Conception exists when a definite and permanent idea of an operative invention, including every feature of the subject matter sought to be patented, is known ... Conception is complete when one of ordinary skill in the art could construct the apparatus without unduly extensive research or experimentation." Id. (internal citations omitted). Otherwise stated, conception is "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed.Cir.1986), quoted in Burroughs Wellcome Co. v. Barr Laboratories, Inc., 40 F.3d 1223, 1228 (Fed.Cir. 1994). "An idea is definite and permanent when the inventor has a specific, settled *1017 idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue." Burroughs Wellcome, 40 F.3d at 1228. The Federal Circuit has noted that "[a]n inventor `may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent.'" Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 624 (Fed.Cir.1985), quoting Hobbs v. United States Atomic Energy Comm'n, 451 F.2d 849, 864 (5th Cir.1971).
Against the decisional backdrop of these articulable principles, "whether particular suggestions and contributions of third persons amount to co-inventorship turns on the facts of the particular case." Hess, 106 F.3d at 981; see also Fina Oil, 123 F.3d at 1473 ["The determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case."]. Upon careful consideration of the particular facts found by the Court, the Court is not persuaded that plaintiff meets its burden of establishing by clear and convincing evidence that Dr. Whiteside and Steve White are co-inventors of defendants' patented L-shaped crimp, provisional crimp, or variable angle crimp as claimed in the '820, '374 and '253 patents respectively. The Court's conclusion turns not on a lack of corroborative evidence concerning the conceptions disclosed by plaintiff's personnel to defendant's but on the character and substance of those contributions, as found by the Court, when compared to the claimed inventions of each of the patents at issue.
As indicated above, the idea the Court finds plaintiff to have disclosed to Mike Sherman at the April 1, 1992 meeting is the concept of preattaching a crimp to a surgical cable by swedging, either the swedging of a portion of the crimp directly to the cable or the swedging of one end of the cable to itself in a manner that integrates the cable and crimp. The Court has further found that Steve White disclosed to Mike Sherman at the same meeting the particular structure of a double-brim top hat crimp as a design which permits preattachment by the second category of swedging, namely by looping one end of the cable around the crimp between the brims, and crimping it permanently to itself to form an attachment between crimp and cable. This particular structure and the second of the two means of preattachment by swedging the cable to itself are not elements of any of defendants' three patents or the claims thereof. The concepts disclosed by Steve White do not therefore qualify him as a co-inventor on any of the three patents.
The patented device of each of defendants' three patents involves the idea disclosed by Dr. Whiteside of preattaching the crimp to one end of the cable by crimping the two together. The jury appears to have found that the idea constituted a trade secret which was then misappropriated by defendant. Nonetheless, the different standards applicable to the patent issue of invention do not yield a result in plaintiff's favor. The idea contributed by Dr. Whiteside and incorporated by defendant into the three patented designs was a general one, and, on the Court's findings of fact set forth above, no conception of a particular structure was disclosed by Dr. Whiteside and later incorporated by defendant into the patented designs. For this reason, the Court concludes that Dr. Whiteside cannot be deemed a co-inventor on the '820, '374 or '253 patents. The specific principle the Court applies is that "each inventor must contribute to the joint arrival at a definite and permanent idea of the invention as it will be used in practice." Burroughs Wellcome, 40 F.3d at 1229. Although the Court would not generalize that a contribution to particular structure is always necessary for joint inventorship, the Court concludes on the particular facts of this case that Dr. Whiteside's contribution did not constitute "`a [sufficiently] firm and definite idea' of the claimed combination as a whole" and so "does not qualify [Dr. Whiteside] as a joint inventor." Ethicon, *1018 135 F.3d at 1460, quoting Hess, 106 F.3d at 981.
The application of these same principles to the facts as found by the jury and the Court readily yields the conclusion that SDGI does not prevail on its sole remaining counterclaim for correction of inventorship on plaintiff's '663 patent on the double top hat crimp. The Court has found that plaintiff's Steve White conceived and sketched the double top hat crimp at the April 1, 1992 meeting. Although some evidence was adduced on the basis of which defendant claims that David Miller may have conceived of a similar design independently, there is no basis for a finding that there was any disclosure of Miller's concept to plaintiff prior to Steve White's April 1, 1992 drawing. Furthermore, the Court notes that defendant's evidence concerning Miller's "double crimp" sketch dated February 8, 1992 gives no indication that Miller specifically conceived of preattaching a cable to the crimp in the manner of plaintiff's double brim top hat crimp. On this evidence, defendant fails to show by clear and convincing evidence that Miller and Sherman were co-inventors of the '663 patent.

B. Reassignment of Patents

The victim of trade secret misappropriation may be entitled to ownership of any patents obtained by the wrongdoer on the misappropriated trade secret. See, e.g., Richardson v. Suzuki Motor Co., Ltd., 868 F.2d 1226, 1249 (Fed.Cir.1989); Raybestos-Manhattan, Inc. v. Rowland, 460 F.2d 697, 700 (4th Cir.1972); Colgate-Palmolive Co. v. Carter Products, Inc., 230 F.2d 855, 865 (4th Cir.1956). Plaintiff seeks reassignment of defendants' '820, '374 and '253 patents to plaintiff. The Court determines that such reassignment is inappropriate because each of the patents contains significant inventive elements of defendant's which were not misappropriated from plaintiff.
The '820 patent is for an integral cable and L-shaped crimp. Several of plaintiff's witnesses characterize drawings on the August 19, 1991 page of Dr. Whiteside's notebook, which were shown to Mike Sherman at the April 1, 1992 meeting, as showing an L-shaped crimp. In the Court's view, such a characterization is overly generous. The two sketches in question are shown in the upper left and lower left quarters of the Court's Exhibit 2. Neither is a detailed or particularly clear sketch of the crimp itself, as both primarily appear to depict the basic design and use of a crimper tool. Neither the shape of the crimp nor the design of its preattachment to the cable is clearly and unambiguously shown in either drawing. Both drawings depict the unattached end of the cable to be threaded vertically through the crimp after looping. Of the two, the upper left sketch may be the more readily characterized as showing an L-shaped crimp, for the reason that the place and angle of preattachment of the cable appears more to be at the side of the crimp and horizontal. Even so, the drawing does not clearly illustrate an L-shaped crimp. The lower left sketch shows a closer view of the crimp, which looks to be top-hat shaped and to have a circular brim at the bottom, with even the preattached cable emerging from the bottom surface of the brim. Neither drawing discloses an L-shaped crimp similar to that patented by defendant in the '820 patent. Further militating against a finding that plaintiff's personnel conceived of an L-shaped crimp is plaintiff's answer to Interrogatory # 5 of defendants' second set of interrogatories, in which plaintiff states that "Dr. Whiteside and Steve White conceived of all of the subject matter shown in Fig. 2 of the '820 patent (as shown in Dr. Whiteside's lab notebook, Plaintiff's Trial Exhibit 1) with the exception of the L-shaped configuration of the crimp." Def.Supp.App., # 18 at p. 1240 (emphasis added).
Even if the Court assumes, however, that these sketches may appropriately be characterized as having disclosed to defendant the general concept of an L-shaped crimp, the claims of the '820 patent have numerous additional elements of which plaintiff does not, and apparently cannot, *1019 claim inventorship. The most obvious such element is the particular orientation of the two separate apertures, one longitudinally through the upright column of the "L" and the other perpendicular to the first through the side of the base of the "L." This orientation is described in the fifth, sixth and seventh elements of Claim 1 of the '820 patent, Plaintiff's Exhibit 26. Dr. Whiteside's notebook sketches cannot be said to have disclosed this level of design detail concerning an L-shaped crimp, and the record does not otherwise support a finding that these elements were derived from plaintiff.
The '374 patent is generally described as covering the method and design of a provisional crimp, one for which a cable clamp with a lever-operated cam allows temporary fixation of the cable prior to final crimping. Among the numerous elements of the claimed invention not alleged or shown to have been misappropriated from plaintiff is the "manually closable and releasable cable clamp" which operates between and independent of the crimp and the tensioning tool. Pltf.Exh. 33, '374 Patent, Col. 6, 11. 51-2. A variable-angle crimp is the subject matter of the '253 patent. Its claims disclose a two-component crimp in which the second component swivels upon the first. Neither this method nor any design for such a crimp were misappropriated from plaintiff.
For all three of the patents at issue, and most obviously for the '374 and '253 patents, significant elements of the invention defined by the claims are not of plaintiff's conception, and the Court therefore readily concludes that a reassignment of those patents from defendants to plaintiff would be inequitable. The Court will not grant such inappropriate relief, and must deny plaintiff's motion for reassignment.

C. Injunctive Relief

Plaintiff asks the Court to enjoin defendants from making or selling surgical cables with an integral crimp for a period of two years and four months. Section 44 of the Restatement (Third) of Unfair Competition discusses the availability of injunctive relief for a continuing misappropriation of trade secrets, and formulates a list of relevant factors derived from the general rules stated in the Restatement (Second) of Torts:
(2) The appropriateness and scope of injunctive relief depend upon a comparative appraisal of all the factors of the case, including the following primary factors:
(a) the nature of the interest to be protected;
(b) the nature and extent of the appropriation;
(c) the relative adequacy to the plaintiff of an injunction and of other remedies;
(d) the relative harm likely to result to the legitimate interests of the defendant if an injunction is granted and to the legitimate interests of the plaintiff if an injunction is denied;
(e) the interests of third persons and the public;
(f) any unreasonable delay by the plaintiff in bringing suit or otherwise asserting its rights;
(g) any related misconduct on the part of the plaintiff; and
(h) the practicality of framing and enforcing the injunction.
Subsection (3) of § 44 further provides that "[t]he duration of injunctive relief in trade secret actions should be limited to the time necessary to protect the plaintiff from any harm attributable to the appropriation and to deprive the defendant of any economic advantage attributable to the appropriation."
Missouri courts have recognized the "head start" principle which may be applicable to appropriately limit injunctive relief to "that period of time which would have been required by defendants to reproduce plaintiff's products without wrongful appropriation." Carboline Company v. Jarboe, 454 S.W.2d 540, 552 (Mo.1970); see also National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 43 (Mo. banc 1966) ["Even in *1020 cases where the court has granted injunctive relief based upon the misuse of actual trade secrets, the courts have limited the term of the injunction to the time which would have been required to reproduce a copyable product."]. Addressing such injunctive relief, § 417.455 R.S.Mo. provides that "[u]pon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation."
The Court's consideration of the propriety of an injunction is here strongly influenced by the ramifications of the jury's damages award, to which the Court has given considerable study. The jury was instructed on three methods of computing damages, plaintiff's lost profits, defendant's unjust enrichment, and a reasonable royalty. The instructions further addressed the potential "headstart" limitation of either lost profits or unjust enrichment damages to that period of time, after public disclosure of plaintiff's trade secret, during which defendant would not have enjoyed the commercial advantage it gained by the misappropriation prior to public disclosure. The jury instructions make no express reference to the time period over which damages are available.
By its evidence and argument at trial, plaintiff sought actual damages of $33,217,423, its expert's assertedly non-duplicative computation of defendant's unjust enrichment and plaintiff's lost profits. This sum included a figure representing the present value of plaintiff's future lost profits from 1999 through 2011, based on plaintiff's theory that the headstart period runs through the duration of the patent protection defendant's misappropriation prevented plaintiff from obtaining.
Defendant's damages expert outlined two methods for calculating damages in the event of liability. The first, based on a headstart period of nine months following plaintiff's alleged public disclosure of the integral crimp concept on January 12, 1994, is a computation of defendant's net profits of $178,211 for that period, of which defendant's expert attributes $49,899 to the crimp itself. The second is a computation of a 5.5% royalty on 28% of defendant's 1994 through 1998 cable sales (28% representing the value the preattached crimp contributes to the total cable design), which yielded damages of $216,184. In closing argument, defendant referred to the $178,211 figure for defendant's profits over a nine-month headstart period.
The jury returned a general verdict which did not indicate which measure or measures of damages it employed. The legal or mathematical theory yielding the jury's $687,797.74 damage award is not readily apparent. What is clear, however, is that the jury instructions did not limit the temporal scope of damages and that the concept of damages extending into the future is not inconsistent with the instructions given. Furthermore, plaintiff's evidence and argument clearly contemplated and sought a damage award including future damages, and defendant, though it argued for a different computation of damages if any, did not contend that future damages were unavailable as a matter of law. On this record, the Court concludes that the jury's damage award, though much smaller than plaintiff desired, represents the amount the jury believed would "fairly compensate plaintiff for damages proximately caused by defendant's use of plaintiff's trade secrets" both to the date of verdict and in the future. Jury Instruction No. 20 [Doc. # 304]. That being the case, an injunction against defendant's future sales would be redundant of the legal relief which the jury has already awarded. In effect, by seeking future damages, plaintiff elected a legal remedy which precludes the equitable remedy of an injunction. Plaintiff's motion for injunctive relief will therefore be denied.
Accordingly, for all the foregoing reasons,
IT IS HEREBY ORDERED that plaintiff's motion to strike defendants' reply in *1021 support of the motion to submit newly discovered evidence [Doc. # 339] is denied.
IT IS FURTHER ORDERED that defendants' motion for leave to file the affidavit of Gordon Carlson in support of the motion for leave to file newly discovered evidence [Doc. # 340] is granted.
IT IS FURTHER ORDERED that defendants Danek Medical, Inc. and SDGI Holdings, Inc.'s motion for leave to file newly discovered evidence [Doc. # 328] is denied.
IT IS FURTHER ORDERED that plaintiff's motion for assignment of patents [Doc. # 312] is denied.
IT IS FURTHER ORDERED that plaintiff's motion for injunctive relief [Doc. # 313] is denied.
 *1022 *1023
NOTES
[1] The Court's references to "defendant" in the singular are therefore to defendant Danek Medical, Inc., unless otherwise indicated.
[2] The Consolidated Appropriations Act of 2000, enacted November 29, 1999, changed the full title of the Commissioner of Patents to "The Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office," and amended Title 35 to refer to the "Director" rather than the "Commissioner."